753 F.2d 1172
 36 Fair Empl.Prac.Cas. 1466,
36 Empl. Prac. Dec. P 34,966
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellee,
and
The City of New York, Plaintiff-Appellee-Cross-Appellant,
v.
LOCAL 638 ... LOCAL 28 OF the SHEET METAL WORKERS'
INTERNATIONAL ASSOCIATION, Local 28 Joint Apprenticeship
..., Sheet Metal and Air-Conditioning Contractors'
Association of New York City, Inc.,
Defendants-Appellants-Cross-Appellees.
LOCAL 28, Third-Party Plaintiff,
v.
NEW YORK STATE DIVISION OF HUMAN RIGHTS, Third-Party
Defendant-Plaintiff-Appellee.
LOCAL 28 JOINT APPRENTICESHIP COMMITTEE, Fourth-Party Plaintiff,
v.
NEW YORK STATE DIVISION OF HUMAN RIGHTS, Fourth-Party Defendant.
 Nos. 1106 to 1111, Dockets 82-6241, 82-6243, 83-6353,
83-6357, 83-6295, 83-6299.
 United States Court of Appeals,
Second Circuit.
 Argued April 13, 1984.
Decided Jan. 16, 1985.
 
 Otto v. Obermaier, New York City (Ronald C. Minkoff, Obermaier, Morvillo & Abramowitz, Edmund P. D'Elia, New York City, William Rothberg, Brooklyn, N.Y., of counsel), for defendants-appellants-cross-appellees Local 28 and Local 28 Joint Apprenticeship Committee.
 Martin R. Gold, New York City (Jane G. Stevens, Deborah Sherman, Gold, Farrell, & Marks, New York City, William Rothberg, Brooklyn, N.Y., of counsel), for defendant-appellant Sheet Metal and Air Conditioning Contractors' Association of New York City, Inc.
 Sheila Abdus-Salaam, Asst. Atty. Gen. of the State of N.Y., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., Rosemarie Rhodes, Alan D. Aviles, Asst. Attys. Gen., New York City, of counsel), for plaintiff-appellee State Division of Human Rights.
 Charles R. Foy, New York City (Frederick A.O. Schwarz, Jr., Corp. Counsel, Francis Caputo, New York City, of counsel), for plaintiff-appellee-cross-appellant City of New York.
 Warren Bo Duplinsky, Atty., Equal Employment Opportunity Commission, Washington, D.C. (David L. Slate, General Counsel, Philip B. Sklover, Associate General Counsel, Barbara Lipsky, Acting Asst. General Counsel, Equal Employment Opportunity Commission, Washington, D.C. of counsel), for plaintiff-appellee Equal Employment Opportunity Commission.
 Before MANSFIELD, WINTER and PRATT, Circuit Judges.
 George C. PRATT, Circuit Judge:
 
 
 1
 Defendants, Local 28 of the Sheet Metal Workers' International Association (Local 28), the Local 28 Joint Apprenticeship Committee (JAC), and the Sheet Metal and Air Conditioning Contractors' Association of New York City (contractors' association) appeal from several orders of the United States District Court for the Southern District of New York, granted by the late Henry F. Werker, Judge, which (1) held all defendants in contempt of court for violating numerous provisions of the Revised Affirmative Action Program and Order (RAAPO) governing defendants' employment practices relating to nonwhites (black and Spanish-surnamed workers); (2) imposed both compensatory and coercive contempt fines to be used to fund supplemental training for nonwhite apprentices; and (3) adopted a new Amended Affirmative Action Plan and Order (AAAPO) proposed by plaintiffs. The City of New York (city) cross-appeals from an order, incorporated in AAAPO, establishing a temporary nonwhite membership goal for Local 28 of 29.23%. As to Local 28 and the JAC, we affirm all but one of the contempt findings and all of the sanctions ordered below; as to the contractors' association, we reverse the only contempt finding attributable to it, and reverse the award of administrative expenses, costs, and attorneys fees against it. We also affirm, with two modifications, the AAAPO entered by the district court. Because Judge Werker's findings with regard to the membership goal contained in AAAPO were not clearly erroneous, we affirm the cross-appeal.
 
 
 2
 These appeals and cross-appeal arise from yet another attempt to force Local 28 and its JAC to correct the discriminatory practices they have used to keep nonwhites out of Local 28. As we have stated before, "Local 28 and the JAC are no strangers to the courts", EEOC v. Local 638, 532 F.2d 821, 824 (2d Cir.1976), and for a more complete history of this protracted struggle we refer the uninitiated reader to the many earlier opinions dealing with these defendants. E.g., State Commission for Human Rights v. Farrell, 43 Misc.2d 958, 252 N.Y.S.2d 649 (New York Cty. 1964); State Commission of Human Rights v. Farrell, 47 Misc.2d 244, 262 N.Y.S.2d 526 (New York Cty. 1965); State Commission of Human Rights v. Farrell, 52 Misc.2d 936, 277 N.Y.S.2d 287 (New York Cty. 1967), aff'd, 27 A.D.2d 327, 278 N.Y.S.2d 982 (1st Dep't), aff'd, 19 N.Y.2d 974, 281 N.Y.S.2d 521, 228 N.E.2d 691 (1967); United States v. Local 638, Enterprise Association, etc., 347 F.Supp. 164 (S.D.N.Y.1972); EEOC v. Local 638, 401 F.Supp. 467 (S.D.N.Y.1975), aff'd as modified, 532 F.2d 821 (2d Cir.1976); EEOC v. Local 638, 421 F.Supp. 603 (S.D.N.Y.1975); EEOC v. Local 638, 565 F.2d 31 (2d Cir.1977).
 
 I. BACKGROUND
 
 3
 Local 28 is a union composed of workers who perform sheet metal work in the New York metropolitan area. At the time this litigation was instituted Local 28 represented sheet metal workers only in New York City; but in 1981 it merged with several of its sister locals and now represents sheet metal workers in New York City, in Nassau and Suffolk counties in New York State, and in Essex, Passaic, Hudson, and Bergen counties in New Jersey.
 
 
 4
 The JAC is a management-labor committee responsible for operating the Sheet Metal Work Apprenticeship Training Program (apprenticeship program), a four-year program designed to teach sheet metal skills. A student entering the apprenticeship program is indentured, and upon graduation becomes a journeyman.
 
 
 5
 The contractors' association, as its name implies, is a trade association of building contractors who perform sheet metal work in New York City. Although not named in the original complaint, the contractors' association was joined by the court to permit complete relief. EEOC v. Local 638, 532 F.2d at 824 n. 3.
 
 
 6
 A. Prior Proceedings.
 
 
 7
 This action was instituted in 1971 by the United States Department of Justice under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. (1982), against Local 28 and the JAC to enjoin a pattern and practice of discrimination against nonwhites. Shortly thereafter, the Equal Employment Opportunity Commission (EEOC) was substituted as plaintiff, the city intervened as a plaintiff, and the New York State Division of Human Rights (state), initially named as a third-party defendant, realigned itself with the EEOC and the city. After a three-week trial in 1975, Judge Werker found that Local 28 and the JAC had purposefully discriminated against nonwhites in violation of Title VII. EEOC v. Local 638, 401 F.Supp. at 486.
 
 
 8
 The district court found that the discriminatory methods used by Local 28 and the JAC effectively obstructed every route that nonwhites might use to gain admission to the union. There are four ways to become a member of the local: (1) graduation from the apprenticeship program; (2) successful performance on a journeyman's examination; (3) transfer from a sister local; and (4) organization of nonunion shops coupled with certification of both employer need and worker ability.
 
 
 9
 Judge Werker found that a majority of Local 28's members were admitted through the apprenticeship program. He further found that entry of nonwhites into that program had been blocked by the JAC and Local 28 by using invalid entrance exams, by requiring that applicants possess a high school diploma, and by inquiring into applicants' arrest records. Significantly, Judge Werker also noted that proof of the plaintiffs' case was made extremely difficult because the union refused to keep records showing each applicant's race and national origin as required by EEOC regulations.
 
 
 10
 Judge Werker further found that the local had impeded the other avenues of entry into the union by using invalid journeymen's examinations, by refusing to accept nonwhite transfers from sister locals while issuing termporary work permits primarily to white workers, and by selectively organizing only those shops having a high percentage of white employees. Id. at 476-87. In July 1975 Judge Werker entered an order and judgment (O & J) which not only prohibited the defendants from discriminating against nonwhites seeking union membership, but also (a) appointed a special master, called an "administrator", to propose and implement an affirmative action plan to govern defendants' employment practices; (b) established a nonwhite union membership goal of 29% to be reached by July 1, 1981; (c) directed defendants to administer a nondiscriminatory "hands-on" journeymen's examination at least once a year; (d) directed defendants to issue temporary work permits on a nondiscriminatory basis; and (e) ordered defendants to conduct a publicity campaign designed to increase nonwhite awareness of employment opportunities in the union. Id. at 489-90.
 
 
 11
 On appeal, we affirmed Judge Werker's finding that Local 28 and the JAC had intentionally violated Title VII, but reversed two provisions of the relief ordered in the O & J and in the Affirmative Action Plan and Order (AAPO), which was adopted by the district court during the pendency of the appeal from the O & J. EEOC v. Local 638, 532 F.2d at 833. After remand, Judge Werker adopted a Revised Affirmative Action Plan and Order (RAAPO) to reflect the modifications this court made to the O & J and AAPO. We subsequently approved RAAPO. EEOC v. Local 638, 565 F.2d at 36.
 
 
 12
 Generally, RAAPO incorporated the provisions of the O & J. It also established intermediate nonwhite membership goals in order to accomplish the ultimate 29% goal, and ordered defendants to develop the apprenticeship program, to increase and maintain nonwhite enrollment, to maintain detailed records regarding union employment practices, and to submit periodic reports summarizing those records.
 
 
 13
 B. The Contempt Proceedings and AAAPO.
 
 
 14
 On April 16, 1982, the city and state moved in the district court for an order holding Local 28, the JAC, the contractors' association, and 121 contractors in contempt for failing to comply with the O & J, RAAPO, and two orders of the administrator. Specifically, plaintiffs alleged that defendants had violated the O & J and RAAPO by not achieving the 29% nonwhite membership goal by July 1, 1982, and that the failure was due to defendants' numerous violations of the district court's orders. Defendants cross-moved to terminate both the O & J and RAAPO. A hearing was held on June 10, 1982, at which both sides submitted voluminous exhibits and live testimony to detail how the O & J and RAAPO had operated over the previous six years.
 
 
 15
 In August 1982 Judge Werker held defendants in civil contempt. Although nonwhite membership in Local 28 was only 10.8% at the time of the hearing, he did not rest his contempt finding on failure to meet the 29% membership goal by the date ordered in RAAPO. Instead, he found that defendants had "failed to comply with RAAPO * * * almost from its date of entry". Specifically, Judge Werker found that "[five] separate actions or omissions on the part of the defendants have impeded the entry of non-whites into Local 28 in contravention of the prior orders of this court." Those five were (1) adoption of a policy of underutilizing the apprenticeship program to the detriment of nonwhites; (2) refusal to conduct the general publicity campaign ordered in RAAPO; (3) adoption of a job protection provision in their collective bargaining agreement that favored older workers and discriminated against nonwhites (older workers' provision); (4) issuance of unauthorized work permits to white workers from sister locals; and (5) failure to maintain and submit the records and reports required by RAAPO, the O & J, and the administrator. After discussing these points Judge Werker concluded: "Based on the foregoing violations of the orders of the court and the Administrator, I have no other recourse but to hold the defendants in civil contempt of court." He did so "without placing primary emphasis on any one of the violations of the RAAPO and O & J", and he noted, "I am convinced that the collective effect of these violations has been to thwart the achievement of the 29 percent goal of non-white membership in Local 28 established by the court in 1975."
 
 
 16
 "[T]o remedy the past noncompliance of the defendants", Judge Werker imposed a fine of $150,000 to be placed in a training fund to be used to increase nonwhite membership in the apprenticeship program and, ultimately, in Local 28. The court directed the administrator to develop a plan detailing the purposes, funding, and operation of the training fund. Finally, the court denied defendants' cross-motion to terminate the O & J and RAAPO.
 
 
 17
 On April 11, 1983, the city brought a second contempt proceeding, this time before the administrator, charging Local 28 and the JAC with additional violations of the O & J and RAAPO, as well as orders of the administrator. By the conclusion of the hearing these charges were distilled into three categories: (1) Local 28's failure to provide the records required by the O & J and RAAPO in a timely fashion; (2) failure by both Local 28 and JAC to provide data that was accurate, and (3) Local 28's failure to serve the O & J and RAAPO on the contractors who hired Local 28's members. After a hearing, the administrator found that plaintiffs had proved the alleged violations, and he recommended that defendants again be held in civil contempt. The remedy suggested by the administrator was that defendants should pay for a computerized recordkeeping system to be maintained by outside consultants and that they should make further contributions to the training fund whose details were still under consideration.
 
 
 18
 After reviewing the arguments of the parties, the record of the hearing held before the administrator, and the objections to the findings of the administrator, Judge Werker adopted the recommendation that Local 28 and the JAC be held in civil contempt for the additional violations. He deferred ruling on the amount of fines to be imposed until the administrator could submit his recommendations regarding the training fund, but he immediately ordered the JAC and Local 28 to pay the cost of outside consultants to monitor computerization of the local's records.
 
 
 19
 In September 1983 Judge Werker entered two more orders. One adopted the administrator's proposal to establish an Employment, Training, Education and Recruitment Fund (the fund). The other adopted the Amended Affirmative Action Plan and Order (AAAPO) proposed by the plaintiffs and the administrator.
 
 
 20
 The training fund was to consist of the $150,000 fine imposed in the first contempt proceeding, as well as the additional fines imposed on the local and the JAC in the second contempt proceeding. These additional fines required Local 28 to contribute $.02 per hour for each journeyman and apprentice hour worked, and further required the contractors' association and the JAC, jointly, to pay the fund's administrative expenses. The general purpose of the fund was to compensate for defendants' underutilization of the apprenticeship program by encouraging the participation of nonwhites.
 
 
 21
 Its immediate objectives were: (1) to create a pool of qualified nonwhite applicants for future apprenticeship programs; (2) to provide counseling and support services to nonwhite apprentices; (3) to provide financial support for out-of-work nonwhite journeymen to encourage them to stay in the trade and to upgrade their skills; (4) to provide financial support to any employer who cannot afford to hire additional apprentices to meet the ratio of one apprentice to every four journeymen required by the court; and (5) to provide incentive or matching funds to attract additional governmental or private job training programs. The fund order also provided that the fund would terminate when the membership goal set out in AAAPO was achieved, and that any monies then remaining in the fund contributed by defendants would be returned to them.
 
 
 22
 AAAPO makes six significant changes to RAAPO: first, the records subject to the reporting requirements are to be computerized by the defendants and monitored by an independent advisor to the administrator; second, it extends its coverage to include the merged locals and their JACs; third, it requires that one nonwhite apprentice be indentured for every white apprentice; fourth, it requires that the contractors employ one apprentice for every four journeymen employed; fifth, it eliminates the administration of an apprenticeship aptitude examination and substitutes a selection board composed of three members, with one representative each chosen by the court, by the defendants, and by the plaintiffs; and sixth, it establishes a nonwhite membership goal of 29.23% to be achieved by July 31, 1987.
 
 
 23
 Local 28 and the JAC have appealed from all of the district court's contempt orders as well as its order adopting AAAPO. The contractors' association has appealed from the district court's first contempt order, and from the order establishing the fund. The city has cross-appealed from that part of AAAPO that establishes 29.23% as the new nonwhite membership goal, contending that the percentage should be higher. Defendants have not appealed from the denial of their cross-motion to terminate the O & J and RAAPO.
 
 II. DISCUSSION
 
 24
 A. Liability for Contempt.
 
 
 25
 It is well settled in this circuit that a party may be held in civil contempt for failure to comply with an order of the court if the order being enforced is "clear and unambiguous, the proof of noncompliance is 'clear and convincing,' " and the defendants have not "been reasonably diligent and energetic in attempting to accomplish what was ordered." Powell v. Ward, 643 F.2d 924, 931 (2d Cir.) (citations omitted), cert. denied, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981). It is not necessary to show that defendants disobeyed the district court's orders willfully. McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); Donovan v. Sovereign Security Ltd., 726 F.2d 55, 59 (2d Cir.1984).
 
 
 26
 When we previously reviewed the district court's 1975 O & J and RAAPO, we affirmed the general provisions of each. EEOC v. Local 638, 565 F.2d at 31. After reexamining the specific provisions of those orders that defendants are now charged with violating, we are satisfied that they are clear and unambiguous. Indeed, defendants do not even claim that the burdens imposed by the O & J and RAAPO were unclear; instead they offer other defenses to excuse their admitted noncompliance.
 
 
 27
 1. Challenges to the First Contempt Proceeding.
 
 
 28
 As to those findings in the first contempt proceeding that relate to the issuance of unauthorized work permits, failure to propose and conduct a general publicity campaign, adoption of the older workers' provision, and the record keeping violations, Local 28 and the JAC virtually concede the facts showing those violations, but offer three arguments to excuse their noncompliance. They first argue that, under p 41(a) of RAAPO, the disputes about unauthorized work permits and failure to conduct the general publicity campaign have been resolved before the administrator and thus are moot. Next, again relying on p 41(a), they argue that plaintiffs failed to complain to the administrator about the older workers' provision and the recordkeeping violations, and were thus barred from doing so after 30 days. Finally, as an alternative, they argue that laches should bar plaintiffs from complaining about any of these four violations. Not one of these arguments has merit.
 
 
 29
 Our examination of the record convinces us that defendants' disputes with plaintiffs and the administrator, with regard to the general publicity campaign and the unauthorized work permits, were never resolved. Judge Werker correctly rejected defendants' second argument when he pointed out that p 41(b) provides that "the parties may make a complaint to the administrator", thus showing that while p 41(a) provided one means to resolve disputes, it was not the only means, and its 30 day limitation period could not bar plaintiffs from complaining to the district court about the older workers' provision and recordkeeping violations.
 
 
 30
 On their alternative laches defense Local 28 and the JAC argue that plaintiffs unreasonably delayed in asserting the contempt claims, that the delay was inexcusable, and that their failure to act quickly prejudiced defendants. Environmental Defense Fund v. Alexander, 614 F.2d 474 (5th Cir.), cert. denied, 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980). Initially, although plaintiffs may have been in the best position to bring defendants' violations to the attention of the district court, it was the defendants who were charged with reasonable diligence and making energetic efforts to comply with the orders of the court. Their attempt to shift the onus of inactivity to plaintiffs is misguided.
 
 
 31
 Even if we were to entertain the laches defense, however, it would fail, for plaintiffs did not sit quietly by while defendants refused to comply with the district court's orders. Instead, they complained, albeit informally, to defendants and to the administrator on many occasions. Defendants had ample notice that plaintiffs were dissatisfied with their efforts, and they cannot credibly claim they relied on plaintiffs' "inaction". Despite repeated urgings by plaintiffs and the administrator, defendants ignored, or at best made only minimal efforts to comply with, the district court's orders. Moreover, plaintiffs initially pursued measures less drastic than contempt in their attempt to urge defendants toward compliance. See United States v. United Shoe Corp., 391 U.S. 244, 249, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968). Defendants' laches defense therefore fails, and the district court's findings of contempt with regard to the issuance of unauthorized work permits, failure to propose the general publicity campaign, and record keeping violations are affirmed. For other reasons discussed below, however, we reverse the finding with respect to the older workers' provision.
 
 
 32
 Local 28 and the JAC raise a more credible challenge to the district court's finding that the apprenticeship program was underutilized. To show that the apprenticeship program was underutilized after the O & J was entered in 1975, Judge Werker sought to compare the number of apprentices indentured between 1971 and 1975 with the number indentured between 1976 and 1981. In so doing, however, he mistakenly compared the total number enrolled in all four years of the program during the period before the O & J, 1971-75 (2,164) with the number indentured, that is the new enrollees, during the period after the O & J, 1976-81 (334). Defendants seize upon this error to argue that the district court's entire finding of underutilization was clearly erroneous, and that the contempt order must therefore be reversed. We disagree with defendants' conclusions.
 
 
 33
 Contrary to the argument advanced by Local 28 and the JAC, Judge Werker's finding of underutilization does not hinge entirely on his mistaken statistical comparison of the pre- and post-judgment figures. That factor was only a small part of the overall evidence showing underutilization of the apprenticeship program. Other evidence showed that after the O & J was entered:
 
 
 34
 (1) There was a sharp increase in the ratio of journeymen to apprentices employed by contractors. It rose from 7:1 before the O & J to 18:1 by 1981. The ratio generally recognized by the industry was 4:1, a ratio that Local 28 indicated it would follow when it registered its apprenticeship program with the New York State Department of Labor.
 
 
 35
 (2) The average number of hours worked annually by Local 28's journeymen increased dramatically from 1,066 in 1975 to 1,666 in 1981.
 
 
 36
 (3) The percentage of unemployed apprentices decreased from 6.7% in 1977 to 0% by 1981.
 
 
 37
 (4) Between July 1981 and March 1982 the union issued more than 200 temporary work permits, predominantly to white journeymen.
 
 
 38
 (5) Defendants refused to conduct the general publicity campaign that was designed to attract nonwhites to the apprenticeship program.
 
 
 39
 In short, despite a need for more apprentices demonstrated by items (1) through (4) above, defendants refused to advertise the apprenticeship program and thereby help fill the need. This evidence solidly supports Judge Werker's conclusion that defendants underutilized the apprenticeship program. Moreover, any lack of more specific figures with respect to utilization of the apprenticeship program is attributable to defendants' failure to comply with the reporting requirements of the court's order. Defendants may not benefit from this non-compliance.
 
 
 40
 Defendants' final challenge to the first contempt proceeding focuses on the older workers' provision. They contend that the district court clearly erred in finding that provision violated the paragraphs of the O & J which enjoined defendants from doing any act with the purpose or effect of discriminating against nonwhites. Defendants contend that the older workers' provision was never implemented, and therefore did not have any effect--discriminatory or otherwise--on nonwhites. We agree.
 
 
 41
 Paragraphs 1, 7, and 21(g) of the O & J enjoin Local 28, the JAC, and the contractors' association from engaging in any act "which has the purpose or effect of discriminating [against nonwhites]". During negotiations on their collective bargaining agreement, Local 28, the contractors' association, and individual employers agreed to amend their labor agreement to provide protection for Local 28 members who were over 52 years of age. They entered into a memorandum of agreement which included the following provision:
 
 
 42
 During periods of unemployment, there shall be a ratio of one man to every four men (1:4) to be fifty-two (52) years and older in the shop and field.
 
 
 43
 The essence of this provision was to ensure that one older worker over 52 would be employed for every four workers employed. There is no claim that its purpose was to discriminate against nonwhites. Instead, plaintiffs claim that this older workers' provision was merely discriminatory in effect, because the percentage of nonwhites in the protected age group was very small as a result of defendants' past discriminatory practices. However, defendants introduced evidence, not contested by plaintiffs, showing that the provision had never been applied in practice. Thus, although plaintiffs proved through the testimony of Dr. Harriet Zollner that, if implemented, the provision would have had a disparate impact, defendants established that no such impact had ever occurred.
 
 
 44
 Plaintiffs, therefore, failed to prove that the older workers' provision had either a discriminatory purpose or present discriminatory effect, and Judge Werker erred in holding Local 28, the JAC, and the contractors' association in contempt for merely agreeing to the older workers' provision. "[A] district court, in exercising the awesome power of contempt, must turn square corners". United States v. Edgerton, 734 F.2d 913, 915 (2d Cir.1984). We therefore reverse the contempt finding against all defendants with regard to the older workers' provision. If the district court concludes that the provision will have a potentially discriminatory effect, it may strike the provision from the collective bargaining agreement and thereby insure that its discriminatory impact will never be felt.
 
 
 45
 However, on this record even such a mild injunctive remedy may be unnecessary in the absence of more facts with respect to the older workers' provision. On oral argument we were told that the provision had been, or was about to be, removed from the collective bargaining agreement entirely. Moreover, in a motion made shortly before oral argument, defendants asserted that the version of the older workers' provision that was actually incorporated into the collective bargaining agreement had applied only to journeymen and not to apprentices. If the provision no longer exists, or alternatively, if it applies only to journeymen and if there is no evidence to suggest that the provision will have a discriminatory effect on nonwhites, then there is no reason in this action to grant any relief with respect to the provision. But without more facts in a properly developed record we can reach no final conclusion. We therefore remand this issue to the district court to determine what provision was actually adopted, and whether that provision will operate to discriminate against nonwhites. If the adopted provision will discriminate, the district court should strike it from the collective bargaining agreement unless defendants delete it voluntarily. If defendants do remove the provision, the whole issue, of course, will be moot.
 
 
 46
 Our reversal of the district court's finding with regard to the older workers' provision also compels us to vacate the relief ordered against the contractors' association in the district court's fund order. Agreement to the older workers' provision was the only alleged contemptuous conduct attributed to the contractors' association. Because of it Judge Werker ordered the contractors' association and the JAC to pay jointly for the administrative costs of the training fund. Since there was no contempt in this regard, however, there is no basis for any relief against the contractors' association. We leave it to the discretion of the district judge to determine how the contractors' association's share of those costs should be reallocated between Local 28 and the JAC.
 
 
 47
 Similarly, we reverse the court's award of attorneys' fees and costs to plaintiffs as against the contractors' association. As will be discussed in II.B., infra, however, the relief ordered against the JAC and Local 28 is solidly supported by the evidence, and remains unaffected by reversal of the contempt finding based on the older workers' provision.
 
 
 48
 To sum up on the first contempt proceeding, we affirm the district court's findings with regard to four of the five bases for its decision. We reverse insofar as a contempt finding was based on the older workers' provision, and we remand to the district court to determine the status and effect of that provision. We also reverse all relief granted against the contractors' association. We now turn to the second contempt proceeding.
 
 
 49
 2. Challenges to the Second Contempt Proceeding.
 
 
 50
 Local 28 and the JAC raise various challenges to the second contempt proceeding conducted before the administrator whose findings were adopted by the district court. They claim (a) that inadmissible hearsay was relied upon by the administrator to prove a violation of the administrator's order, (b) that their misdesignation of the race of two workers was a de minimis violation of RAAPO, (c) that the administrator waived any reporting requirements as to the merged locals, and (d) that the plaintiffs complaint about inaccurate man-hour reports was barred by laches.
 
 
 51
 (a) Local 28 was charged with violating an order of the administrator requiring it to serve the O & J and RAAPO on each employer by mail that was "certified, return receipt requested. Copies of the certification cards are to be provided to the parties upon their receipt by Local 28." At the second contempt hearing, plaintiffs introduced evidence to show that before the proceedings were instituted, the plaintiffs had asked Local 28 for a list of the contractors served and proof of that service. Local 28's counsel responded that he was unable to obtain proof of service. The city then requested an affidavit "from the Local 28 official responsible for service of the O & J and RAAPO", but no affidavit was ever provided.
 
 
 52
 In addition to the foregoing evidence, plaintiffs also offered, and the administrator erroneously admitted, hearsay testimony of a contractor to prove nonservice of the O & J and RAAP. In response, Local 28 again did not produce any witness to testify about service of the O & J and RAAPO, but counsel for Local 28 sought to testify about the procedures used. The administrator correctly prevented counsel from testifying on ethical grounds and because he thought the violation was shown as soon as certification was not produced. Defendants offered no evidence to show compliance with the administrator's order. We think it clear that the administrator erroneously admitted the hearsay testimony, but the error was harmless because the improper testimony was superfluous.
 
 
 53
 (b) Local 28 next contends that the misdesignation of the race of two of its members was a de minimis violation of RAAPO. If this finding stood alone, we might agree. However, when examined in light of all the violations alleged in both proceedings, we are convinced that this violation further reflects defendants' unwillingness to comply with RAAPO. Thus, we reject defendants' de minimis argument.
 
 
 54
 (c) Defendants also argue that the administrator waived the reporting requirements as to merged locals. We find no evidence in the record to support a waiver. On the contrary, the administrator urged Local 28 to have its records include data on the merged locals, but defendants ignored him.
 
 
 55
 (d) Finally, defendants urge laches as a bar to plaintiffs' complaints about inaccurate man-hour reports because "the city should have been aware that the JAC's apprentice manhour reports were inaccurate." Again defendants misconstrue the obligations of the parties: it is defendants who are charged with the duty to comply with the court's orders, not plaintiffs. Defendants cannot complain simply because plaintiffs did not discover defendants' errors sooner, for they disregarded the court's orders at their own peril. See McComb v. Jacksonville Paper Co., 336 U.S. at 192, 69 S.Ct. at 500. Defendants' laches defense also fails because they have pointed to no evidence showing either reliance on plaintiff's inactivity, or prejudice resulting therefrom.
 
 
 56
 In sum, on the second contempt proceeding, the district court's determination that defendants had violated several provisions of the O & J, RAAPO, and the administrator's orders was supported by clear and convincing evidence which showed that defendants had not been reasonably diligent in attempting to comply with the orders of the court and the administrator.
 
 
 57
 In his dissenting opinion, our colleague, Judge Winter, expresses the view that Judge Werker's findings of contempt were clearly erroneous because "[t]he union's only pertinent obligation under RAAPO * * * is to report on the number of apprentices indentured and to obey any decision by the Administrator altering that number * * * ", and because "there is absolutely no basis for the claim of apprenticeship under-utilization once the economic circumstances are taken into account". We think such a view treats Judge Werker's approach to the contempt issue too narrowly. For over 15 years both the federal and state courts have sought to require Local 28 to end its unlawful discrimination against minorities. While the factor of under-utilizing apprentices may in one sense be viewed, as Judge Winter describes it, as "the centerpiece of the contempt finding", it assumes that position only because it is not only a partial cause of the lack of sufficient progress in integrating the union but also a point at which the success or failure of the program can be readily measured. In other words, failure to have the apprentices employed is both an independent ground for contempt and a symptom of the effects of defendants' other kinds of contemptuous conduct.
 
 
 58
 Many of the uncertainties about underutilization that are urged by defendants are due in large part to the union's noncompliance with the reporting provisions of RAAPO. Had the union complied promptly and accurately with the recordkeeping and reporting requirements the picture as to underutilization would be clearer.
 
 
 59
 Nor are the difficult economic circumstances of the sheet metal workers an adequate justification for the union's continued discrimination. Even if it were true, as Judge Winter states, that the union "faced an excruciating reduction in demand for its services in the years in question", that circumstances would not justify the union's discriminatory favoring of journeymen over apprentices, a fact that is crystal clear from (1) the tremendous increase during the relevant period in the apprentice: journeymen ratio from 1:7 to 1:18 and (2) from the decline in percentage of unemployed apprentices during the period 1977-1981 from 6.7% to 0%. One of the principal reasons for revising the original AAPO into RAAPO was to adjust for the "changed working and employment conditions in the sheetmetal industry in New York City, including the present severe and widespread unemployment in the industry." RAAPO p 1.
 
 
 60
 Indeed, RAAPO was designed both "to assure that in light of these changed circumstances and conditions" the 29% goal would be reached by July 1, 1982, and "to assure that substantial and regular progress is made toward this goal in each year prior to 1982." Id. Most significantly, RAAPO provided that the goal of the revised program was "to assure that all members and apprentices of Local 28 share equitably in all available employment opportunities in the industry." RAAPO p 1 (emphasis added). It was not RAAPO's intent, therefore, that difficult economic circumstances would permit the largely white group of journeymen to be preferred in work allocations over the racially integrated group of apprentices; yet that is precisely the effect of the combined violations of the O & J and RAAPO found by Judge Werker below. We reject the tacit premise behind Judge Winter's opinion that the burden of more difficult economic circumstances may, through changed employment patterns, be shifted to the minorities. Particularly in light of the determined resistance by Local 28 to all efforts to integrate its membership, we think the combination of violations found by Judge Werker below amply demonstrates the union's foot-dragging egregious noncompliance with the O & J and RAAPO and adequately supports his finding of civil contempt against both Local 28 and the JAC.
 
 
 61
 B. Contempt Remedies: The Fund and the Order to Computerize Records.
 
 
 62
 "Generally, the sanctions imposed after a finding of civil contempt serve two functions: to coerce future compliance and to remedy past noncompliance." Vuitton et Fils v. Carousel Handbags, 592 F.2d 126, 130 (2d Cir.1979); see United States v. United Mine Workers of America, 330 U.S. 258, 303-04, 67 S.Ct. 677, 701, 91 L.Ed 884 (1947). "The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief." McComb v. Jacksonville Paper Co., 336 U.S. at 193-94, 69 S.Ct. at 500. With these principles in mind, consider Local 28's and the JAC's challenges to the relief imposed by the district court to remedy defendants' contemptuous conduct. This discussion is limited to Local 28 and the JAC because we are reversing all contempt relief ordered against the contractors' association. See II.A., supra.
 
 
 63
 At the outset, Local 28 and the JAC claim that the remedies imposed in the first contempt order are neither compensatory nor coercive, and thus must be deemed punitive. Soobzokov v. CBS, Inc., 642 F.2d 28, 31 (2d Cir.1981). Since punitive remedies may be imposed for only criminal contempt, whose due process requirements were not followed here, see Cheff v. Schnackenberg, 384 U.S. 373, 380, 86 S.Ct. 1523, 1526, 16 L.Ed.2d 629 (1966), they conclude that the first contempt proceeding must be reversed. We think defendants read the first contempt decision much too narrowly, because its remedies, including the training fund, have both compensatory and coercive functions.
 
 
 64
 After finding that the evidence proved clearly and convincingly numerous violations of the O & J, RAAPO, and orders of the administrator, Judge Werker was faced with the task of crafting appropriate relief "to remedy the past noncompliance of the defendants." He chose to aim the relief where it would be most effective--the apprenticeship program--and he embraced the idea of a fund "for the purpose of developing the apprenticeship program of Local 28, with an eye toward increasing the non-white membership of the program and the union." The fund's purpose was to compensate nonwhites, not with a money award, but by improving the route they most frequently travel in seeking union membership. Thus it was specifically intended to compensate those who had suffered most from defendants' contemptuous underutilization of the apprenticeship program, which had "impeded the entry of non-whites into Local 28 in contravention of the prior orders of [the district] court."
 
 
 65
 The fund also has coercive components. For example, paragraph 3 of the order establishing the fund provides that it will remain in existence "until the [29% membership goal] * * * is achieved". Paragraph 5 further provides that, upon termination, the remaining monies will be returned to defendants after plaintiffs are reimbursed for any contributions they might make to the fund. In addition, Local 28's contributions to the fund based on hours worked by its members will cease when the membership goal is achieved.
 
 
 66
 The JAC and Local 28 next contend that if any finding underlying the two contempt proceedings is reversed, the entire remedy must be vacated. While this might be a tenable argument if the fines had been imposed for multiple findings of criminal contempt, see Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 440, 31 S.Ct. 492, 497, 55 L.Ed. 797 (1911), we do not think it governs our decision in these civil contempt proceedings.
 
 
 67
 In the first contempt decision the district court found that the defendants had committed five violations of prior court orders: underutilization of the apprenticeship program, reporting violations, failure to conduct the general publicity campaign, unauthorized issuance of work permits, and adoption of the discriminatory older workers' provision. We have reversed the last finding because the conduct proved does not violate a clear order of the court. However, the older workers' provision presents a problem separate from the other violations. Since that provision was not implemented, it had no past impact on the apprenticeship program, and since it will not be applied in the future no purpose would be served by permitting its reversal to undermine the fund order. Indeed, defendants virtually concede in their brief that the fund order was aimed primarily at the finding that the apprenticeship program was underutilized. Thus, we conclude that reversal on the older workers' provision is not fatal to the fund order because the remedies ordered are amply warranted by the other findings of contempt, and we affirm them on the basis of those findings.
 
 
 68
 Finally, the JAC and Local 28 have not challenged the order which requires them to pay the cost of monitoring the computerized recordkeeping system. We therefore affirm that order. We turn now to the parties' various challenges to certain provisions of AAAPO.
 
 
 69
 C. Challenges to AAAPO.
 
 
 70
 In November 1983 Judge Werker approved the third version of the affirmative action plan (AAAPO), which affects Local 28, its JAC, the locals that had been merged into Local 28, their JACs, and all contractors who use the union's sheet metal workers. AAAPO modified RAAPO in six significant ways. It (1) increased the nonwhite membership goal from 29% to 29.23% to reflect the addition of the merged locals; (2) established an apprentice to journeymen ratio of 1:4; (3) created a three-member apprentice selection board; (4) imposed an indenture ratio of one nonwhite for every white admitted to the apprenticeship program; (5) permitted work to continue on developing new selection procedures, but barred their use until the membership goal could be accomplished; and (6) incorporated the order requiring defendants to bear the cost of an advisor to monitor the computerization of Local 28's records.
 
 
 71
 AAAPO was a response by the district court to three developments in this case: first, Local 28's failure to meet the 29% nonwhite membership goal by July 1, 1982; second, Local 28's contemptuous refusal to comply with many provisions of RAAPO; and third, the merger of several largely white locals outside New York City into Local 28.
 
 
 72
 Local 28 and the JAC challenge the district court's adoption of AAAPO, however, contending that: (1) AAAPO contravenes Title VII and the equal protection component of the fifth amendment; (2) AAAPO unduly interferes with union government; and (3) the district court abused its discretion by adopting five of the six provisions of AAAPO described above. On its cross-appeal the city contends that the findings underlying the district court's adoption of the 29.23% interim nonwhite membership goal were clearly erroneous, and that the figures should have been higher.
 
 
 73
 Since entry of the O & J in 1975, the district court has retained jurisdiction "to enter such orders as may be necessary to effectuate the equal employment opportunities for non-whites and other appropriate relief"; consequently, additional violations of Title VII were not needed to trigger modifications of the remedies that were originally ordered. See United States v. Local Union No. 212, 472 F.2d 634, 635-36 (6th Cir.1973). Any changes made by the district judge were to be guided by the sound exercise of his equitable discretion, see Rios v. Enterprise Association of Steamfitters Local 638, 501 F.2d 622, 631 (2d Cir.1974), and our task is not to exercise our own discretion, but to determine whether the district judge has abused his. Association Against Discrimination v. City of Bridgeport, 647 F.2d 256, 279 (2d Cir.1981), cert. denied, 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982).
 
 
 74
 Defendants' first challenge to AAAPO need not detain us long. Defendants contend that the core provisions, which constitute the affirmative action program, violate Title VII and equal protection. We disagree. This court has consistently held that appropriate affirmative action measures are not proscribed by Title VII, see Association Against Discrimination v. City of Bridgeport, 647 F.2d at 280; EEOC v. Local 638, 532 F.2d at 827; Rios v. Enterprise Association of Steamfitters Local 638, 501 F.2d at 629-31, or by the constitution. Id. at 628 (citations omitted). Moreover, this court has twice upheld the affirmative action provisions of RAAPO, EEOC v. Local 638, 532 F.2d at 829-33; EEOC v. Local 638, 565 F.2d at 33-36, and we therefore reject any challenge to the parallel provisions contained in AAAPO.
 
 
 75
 Finally, we believe that defendants' attempt to rely on Firefighters Local Union No. 1784 v. Stotts, --- U.S. ----, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), is misplaced. Defendants argue that Stotts eliminates all race-conscious relief except that benefitting specifically identified victims of past discrimination. We do not accept defendants' expansive interpretation of that opinion.
 
 
 76
 In Stotts, a federal district court enjoined the city of Memphis from laying off black fire department employees in accordance with the seniority system contained in the collective bargaining agreement governing relations between the city and its employees. The black workers had been hired pursuant to a year-old consent decree settling prior charges of employer discrimination. The consent decree did not find that Memphis had violated Title VII, and did not identify any particular employee who had suffered from the alleged discrimination. In granting the injunction, the district judge found that although the seniority provision was not adopted with discriminatory intent, it nevertheless had to give way to the consent decree because of the discriminatory effect that would result from the city's use of the seniority system. Id., 104 S.Ct. at 2581-82. The district court's injunction was affirmed on appeal to the sixth circuit, 679 F.2d 541 (6th Cir.1982), and the Supreme Court reversed. 104 S.Ct. at 2590.
 
 
 77
 Stotts can be distinguished from the present case in at least three ways. First, the affirmative action ordered by the district court in that case was in direct conflict with a bona fide seniority plan that was protected by Sec. 703(h) of Title VII. Id. at 2587. In our case Sec. 703(h) is not involved because there is no seniority plan in conflict with the remedies imposed by AAAPO or the fund order. Second, the court's discussion of Sec. 706(g), particularly relied on by the defendants here, related only to the "make whole" relief ordered in the district court, id. at 2589, and did not address prospective relief like that ordered in AAAPO and the fund order. Third, in Stotts there was no finding of any intent to discriminate, id. at 2581, whereas in this case we have affirmed the district court's finding that defendants have intentionally discriminated against nonwhites. These three factors significantly distinguish Stotts from the case at bar and undercut defendants' reliance on that case. Thus, defendants first challenge to AAAPO fails.
 
 
 78
 Local 28's complaint that the obligations imposed by AAAPO will interfere with its right to self-government need not detain us either. We have rejected this contention on previous appeals, e.g., EEOC v. Local 638, 532 F.2d at 829, and we reiterate that the government of Local 28 will be returned to its members as soon as it ends it unlawful discrimination against nonwhites. Until that time the government of Local 28 must remain subject to the supervision of the district court and the administrator.
 
 
 79
 There being no merit to defendants' first two contentions, we turn to defendants' challenges to the specific remedial provisions added by AAAPO.
 
 
 80
 1. The 29.23% Nonwhite Membership Goal.
 
 
 81
 We reject defendants' attempt to characterize the membership goal as a permanent quota, because the provision at issue is clearly not a quota, but a permissible goal. See Rios v. Enterprise Association Steamfitters Local 638, 501 F.2d at 628 n. 3.
 
 
 82
 This circuit has a well-established two-pronged test for the validity of a temporary, race-conscious affirmative action remedy such as a membership goal:
 
 
 83
 There must first be a "clear cut pattern of long-continued and egregious racial discrimination". Second, the effect of reverse discrimination must not be "identifiable", that is to say, concentrated upon a relatively small, ascertainable group of non-minority persons.
 
 
 84
 EEOC v. Local 638, 532 F.2d at 828 (quoting Kirkland v. New York State Dep't of Correctional Services, 520 F.2d 420, 427 (2d Cir.), rehearing en banc denied, 531 F.2d 5 (1975), cert. denied, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976)).
 
 
 85
 A race-conscious goal in AAAPO passes this test as it did in RAAPO in 1976. This court has twice recognized Local 28's long continued and egregious racial discrimination, EEOC v. Local 638, 532 F.2d at 825; EEOC v. Local 638, 565 F.2d at 36 n. 8, and Local 28 has presented no facts to indicate that our earlier observations are no longer apposite. Certainly, the effects of the union's discriminatory conduct have not been eliminated, for its nonwhite membership is still only 10.8%. Therefore, Kirkland's first prong has been satisfied.
 
 
 86
 We think the second prong has been satisfied as well, because the effects of the affirmative action remedies incorporated in AAAPO will not unnecessarily trammel the rights of any readily ascertainable group of nonminority individuals. Indeed, Local 28 does not attempt to show that the whites who might be affected by the established goals are any more identifiable now than they were in 1976 and 1977 when we approved the same type of provision in RAAPO.
 
 
 87
 Local 28 does argue, however, that the membership goal set forth in AAAPO has become "permanent", because at its target date it will have been in effect for eleven years. Defendants' argument is faulty in two respects. First, "temporary" in the context of the imposition of affirmative action remedies means that the remedies will be in place only until the effects of the past discrimination have been eliminated, see United Steel Workers of America v. Weber, 443 U.S. 193, 208-09, 99 S.Ct. 2721, 2729-30, 61 L.Ed.2d 480 (1979), and because AAAPO will cease when those effects are eliminated from Local 28, the goal is, by definition, temporary, not permanent. Second, even if permanency were merely a function of time, the responsibility for this membership goal's being "permanent" would have to be laid solely at the feet of the defendants, because it has been their foot-dragging resistance to compliance with the prior orders that has caused the district court to extend the nonwhite membership goal until 1987.
 
 
 88
 On cross-appeal, the City of New York has also challenged AAAPO's goal, but for a different reason. It contends that the district court's adoption of the 29.23% figure was too low and clearly erroneous. After reviewing the record of the hearing held on this issue, we conclude that the district court's findings were not clearly erroneous, and, indeed, are amply supported by the evidence. Thus, we affirm the 29.23% figure adopted by the district court.
 
 
 89
 2. The 1:4 Apprentice: Journeymen Ratio.
 
 
 90
 AAAPO requires the union to refer for work, and the sheet metal employers to hire, one apprentice for every four journeymen. Defendants attack this provision hypothetically, contending that if we reverse the district court's contempt finding with regard to underutilization of the apprenticeship program, then we must also reverse this provision. Taking defendants' argument simply as posed, we would have to affirm the 1:4 apprentice: journeymen ratio because we are not reversing, but affirming, the underutilization findings by the district court.
 
 
 91
 Going further, however, the 1:4 ratio is a critical element in AAAPO because it helps insure that defendants will not underutilize the apprenticeship program in the future. Because of the ratio employers will be motivated to hire more apprentices and they will have the court's assistance in overcoming union opposition; the union faces further contempt penalties if it does not cooperate in meeting the ratio; and the JAC will have to admit more apprentices to its program in order to meet the increased demand for apprentice labor. Moreover, additional jobs available to apprentices will, in time, help to attract larger apprentice classes.
 
 
 92
 Finally, we think the 1:4 ratio requirement is reasonable and flexible--reasonable, because it reflects a ratio that the industry has historically followed; flexible, because exemption from the ratio in particular cases may be obtained upon a proper showing. Thus, we affirm the 1:4 ratio provision of AAAPO.
 
 
 93
 3. Apprentice Selection Board.
 
 
 94
 AAAPO, paragraphs 13 & 14, provides for an apprentice selection board to "establish standards and procedures for the selection of apprentices." The board is composed of one designee each from the plaintiffs, the JAC, and the court. It is charged with selecting both nonwhite and white apprentices to enter the apprenticeship program.
 
 
 95
 Defendants claim that the selection board provision will have an adverse impact on the union's freedom to govern its own affairs. We have rejected this argument when raised in prior challenges to similar provisions, EEOC v. Local 638, 565 F.2d at 33-34, and we find it no more persuasive here. Since it is an interim measure, the board can be disbanded as soon as the nonwhite membership goal is reached. Unlike a provision rejected by us in the 1976 appeal to this court, EEOC v. Local 638, 532 F.2d at 830, the racial makeup of the board under AAAPO is not prescribed. This selection board is more analogous to the board of examiners approved in RAAPO.
 
 
 96
 4. Elimination of the Apprentice Examination.
 
 
 97
 Paragraphs 25-28 of RAAPO ordered defendants to develop and administer apprentice entrance examinations validated by the EEOC, and in the amended affirmative action plan proposed by plaintiffs these requirements were carried forward. However, in his order adopting AAAPO, entered on September 1, 1983, Judge Werker eliminated the provisions in plaintiffs' proposal that called for administration of apprenticeship examinations. He found that many had complained of the tests' adverse impact on nonwhites, that agreement on the tests' validity was virtually impossible, and that the tests were costly to administer. AAAPO takes a new approach to the apprentice selection procedure. It substitutes the selection board discussed above, and also orders defendants to work with industrial psychologists to develop objective, nondiscriminatory selection procedures.
 
 
 98
 On appeal, the EEOC contends that paragraph 15 of AAAPO prohibits the use of the new selection procedures to be developed, even if proven nondiscriminatory, until the 29.23% membership goal is reached. Although we do not necessarily agree with the EEOC's narrow reading of AAAPO, in order to eliminate any possible confusion, we direct that paragraph 15 of AAAPO be amended to state:
 
 
 99
 15. Upon termination by court order of this AAAPO, or at such earlier time as the court may order, the defendants and the JAC's shall use selection procedures for admission to the apprentice program as developed pursuant to Paragraphs 16 through 20. Such selection procedures shall be designed to have the least adverse impact on non-whites. [New matter in italics].
 
 
 100
 With this provision the defendants may use new selection procedures at any time after they prove to the district court that they are nondiscriminatory.
 
 
 101
 5. The Nonwhite to White Indenture Ratio.
 
 
 102
 In order to insure that adequate numbers of nonwhites are taken into the apprenticeship program, the district court provided in AAAPO that the JAC must indenture one nonwhite apprentice for every white apprentice. Local 28 and the JAC, joined by the EEOC, challenge this 1:1 indenture ratio as an abuse of the district court's discretion. We agree.
 
 
 103
 We have recognized that temporary hiring ratios may be necessary in order to achieve integration of a work force from which minorities have been unlawfully barred. Association Against Discrimination v. City of Bridgeport, 647 F.2d at 283; United States v. City of Buffalo, 633 F.2d 643, 646-47 (2d Cir.1980). However, such race-conscious ratios are extreme remedies that must be used sparingly and "carefully tailored to fit the violations found", Association Against Discrimination v. City of Bridgeport, 647 F.2d at 281, and we will approve such ratios only where "no other method was available for affording appropriate relief". Vulcan Society of the New York City Fire Department, Inc. v. Civil Service Commission, 490 F.2d 387, 398 (2d Cir.1973); Bridgeport Guardians, Inc. v. City of Bridgeport, 482 F.2d 1333, 1341 (2d Cir.1973), cert. denied, 421 U.S. 991, 95 S.Ct. 1997, 47 L.Ed.2d 481 (1975).
 
 
 104
 Here, other methods do seem to be available. To begin with, defendants have voluntarily indentured 45% nonwhites in the apprenticeship classes since January 1981, and there is no indication that defendants will in the future deviate from this established, voluntary practice. Moreover, should defendants abandon the practice, the district court could modify its order at that time. Finally, the district court's selection board will be fully able to watch over the process and insure that a sufficient number of nonwhite apprentices is selected. Since these alternative methods seem well-calculated to assure an appropriate nonwhite ratio in the apprenticeship program, it was an abuse of discretion for the district court to impose the 1:1 indenture ratio at this time, and we strike that provision from AAAPO.
 
 III. CONCLUSION
 
 105
 We affirm all but one of Judge Werker's findings of contempt against the defendants. We reverse and remand for further proceedings Judge Werker's finding that agreement to the older workers' provision violated the O & J and RAAPO. Because that is the sole finding of contempt against the contractors' association, we reverse the contempt relief and the awards of administrative expenses, attorneys' fees and costs ordered against it. We affirm, however, all of the contempt relief ordered against Local 28 and the JAC. We also affirm, with two modifications, the AAAPO adopted by Judge Werker. Finally, we affirm the order, incorporated in AAAPO, establishing a temporary, nonwhite membership goal of 29.23%.
 
 WINTER, Circuit Judge, dissenting:
 
 106
 This case, which raises sensitive constitutional issues regarding the judicial imposition of racial quotas, controversial questions of statutory interpretation concerning so-called reverse discrimination as a remedy under Title VII, and more mundane yet important legal issues as to use of the contempt power, divides this court for a third time. EEOC v. Local 638, 565 F.2d 31, 37 (2d Cir.1977) (Meskill, J., dissenting); EEOC v. Local 638, 532 F.2d 821, 833 (2d Cir.1976) (Feinberg, C.J., concurring). On previous occasions, we approved entry of an Order and Judgment ("O & J") and "Revised Affirmative Action Program and Order" ("RAAPO"). These constitute a complex code of conduct encompassing forty-five pages of substantive and procedural detail with regard to admission to the apprenticeship program, membership in Local 28 and job referral in the sheet metal industry. The O & J and RAAPO vest direct control over these matters in the administrator, who is in effect a receiver with power, inter alia, to govern Local 28 so far as the recruitment and admission of minorities to the union and the referral of apprentices to jobs are concerned. We also established, over Judge Meskill's dissent, a 29% goal for minority membership in Local 28 to be achieved through the O & J and RAAPO.
 
 
 107
 My disagreement with the majority stems largely from its failure to address the fact that Local 28 had the approval of the administrator for every act it took that affected the number of minority workers entering the sheet metal industry. The majority's tacit premise thus is that full compliance with the specific terms of the O & J and RAAPO is legally insufficient to avoid sanctions for contempt if the 29% goal is not met. This holding transforms the 29% figure from a goal guiding the administrator's decisions into an inflexible racial quota.
 
 
 108
 Consider, for example, the alleged underutilization of the apprenticeship program by Local 28. This charge is by far the most important since that program provides 90% of the union's new members and underutilization is the only allegedly contumacious conduct of Local 28 which could have seriously diminished the number of minority workers entering the sheet metal industry. It is thus the only allegation even remotely justifying the extra-ordinary sanctions imposed.
 
 
 109
 In my view, Local 28's actions cannot constitute contempt under the O & J and RAAPO because the final authority with regard to the utilization of the apprenticeship program lay with the administrator, and he approved the number of apprentices indentured throughout the period in question. Paragraph 14 of the O & J, set out in the margin,[1] gives the administrator full power over the apprenticeship program, including the number of persons to be admitted. The RAAPO, promulgated pursuant to the O & J, specified that no less than 36 apprentices be indentured by February, 1977, and provided that the size of future classes be determined by the following procedure:
 
 
 110
 Upon consideration of the goals of this Revised Program, and the availability of employment opportunities in the industry, the JAC shall forward its recommendation of the number of apprentices to be indentured in each class ... to counsel for the parties and the Administrator .... The Administrator shall review the recommendations .... Upon a finding that the JAC's recommendation does not meet the goals and objectives of the Revised Program the Administrator shall render his determination as to the appropriate number of apprentices to be indentured.
 
 
 111
 The history of the RAAPO indicates that the administrator was to determine the number of apprentices to be indentured periodically after taking prevailing economic conditions into account. The RAAPO replaced the first affirmative action plan and order ("AAPO"), which dictated fixed numbers of apprentices to be indentured periodically, but which the administrator found to be unrealistic in view of the sheet metal industry's depressed economic conditions.[2] After the district court approved the O & J and RAAPO, Local 28 appealed and challenged the provisions relating to the apprenticeship program as unduly intrusive on the union's self-government. This court rejected that argument and Judge Smith's opinion expressly stated that the "[i]ndenture of apprentices ... is appropriately subject to administrator oversight. The balancing of the need for training workers against existing economic conditions is appropriately left to his informed discretion." 565 F.2d at 35 (emphasis added).
 
 
 112
 The union's obligation under RAAPO, therefore, is to report on the number of apprentices indentured and to obey any decision by the administrator altering that number on his own initiative or upon objection by the plaintiffs. After final entry of the O & J and RAAPO, the union informed the administrator and the plaintiffs virtually every month of the number of apprentices in the program.[3] Those reports are in the record. On no occasion did the administrator order the union to increase the number of apprentices indentured. Nor did the plaintiffs object to the numbers submitted, as the provision for notice to them contemplated and as they had the clear power to do under Paragraph 15 of the O & J.[4]
 
 
 113
 For all that appears in the record, the level of utilization of the apprenticeship program, the centerpiece of Judge Werker's contempt finding, was never a serious issue between the parties before the district judge's decision. The claim of underutilization was not even raised by the plaintiffs in their motion for contempt. The issue literally crept into the case only when Local 28 attempted to show its good faith by relying in its brief in response to the contempt motion on its efforts to recruit minorities into the apprenticeship program and on the fact that every apprenticeship class after entry of the O & J began with 45% minority members. The plaintiffs addressed the apprenticeship issue for the first time in their reply brief and only then asserted underutilization as a ground for contempt. In the hearing before the district judge, the size of the apprenticeship program was mentioned only by the union, again to demonstrate its good faith efforts.
 
 
 114
 With the issue thus in the posture of an afterthought, the district judge seized upon certain statistics relating to total apprenticeship enrollment and found as a fact that the union deliberately reduced enrollment in the program after final entry of the O & J following our decision in October, 1977. Everyone, including the plaintiffs and the majority, concedes that these statistics were misunderstood by the district court and do not support the conclusion reached. Moreover, in drawing that conclusion, the district judge made no reference whatsoever to the elaborate procedures established in the O & J and RAAPO to determine the size of the apprenticeship program, to the administrator's plenary authority in that regard, to the fact that Local 28 was never ordered by the administrator to increase the number indentured, or to the plaintiffs' opportunity to object as contemplated by the RAAPO.
 
 
 115
 The majority now affirms the district court on the grounds that its finding is not clearly erroneous. However, it treats the finding not as one of a deliberate evasion of the O & J and RAAPO by reducing the number of apprentices enrolled after their entry but rather as a more general finding of underutilization not involving an actual reduction of apprentice enrollment. This alteration of the district court's finding is necessary because the number of apprentices enrolled after final entry of the O & J did not generally decline.[5] The majority also does not discuss the relationship of the O & J and RAAPO to the union's obligations with regard to the apprenticeship program. Since it also does not state what provision of the district court's order has been violated by the operation of the apprenticeship program, one can infer only that the contempt in its view lies not in any failure to comply with the elaborate provisions of the O & J and RAAPO but solely in the failure to reach the 29% racial goal.
 
 
 116
 Respectfully, I believe the majority is in error in so concluding because the union's obligation with regard to the apprenticeship program is clearly limited to compliance with the specific provisions of the O & J and RAAPO. Indeed, rigid enforcement of the 29% goal without regard to economic or other circumstances is not consistent with the O & J and RAAPO, with our prior decisions in this very case, with Title VII, or probably with the Constitution.
 
 
 117
 Since the O & J and RAAPO became effective, Local 28 has essentially been in a receivership so far as admissions to membership or job referral are concerned. In the words of Judge Smith, the administrator has the power "to exercise day-to-day oversight of the union's affairs." 532 F.2d at 829. The practical function of the 29% goal is not to impose some overweening obligation on the union but to guide the administrator in determining what Local 28 is to do under the O & J and RAAPO. There is simply no reason whatsoever for a court to deprive a union of its self-governance and impose on it the costs of judicial administration of its affairs only to deny that compliance with the decisions of the court-appointed administrator fulfills the union's obligations. The majority's use of rhetorical assaults and punitive sanctions against Local 28 simply cannot be reconciled with its failure to utter even muted criticism of the administrator who repeatedly authorized the supposedly contumacious acts and continues in office to this day.
 
 
 118
 Judge Smith's second opinion also explicitly recognized that the number of apprentices indentured must be determined by the administrator in light of "existing economic conditions," 565 F.2d at 35. The majority "rejects" the so-called "tacit premise" of this dissent that difficult economic circumstances may justify reducing the number of new apprentices and thus the number of new minority members. In doing so, of course, it is rejecting Judge Smith's prior ruling in this very case.
 
 
 119
 As the record amply demonstrates, Local 28 faced an excruciating reduction in demand for its services in the years in question. In fact, the reason for the administrator's revision of the fixed enrollment requirements of the AAPO, see note 2, supra, was "the present changed working and employment conditions in the sheetmetal industry in New York City, including the present severe and widespread unemployment in the industry." Because of shifting economic circumstances, the RAAPO, as proposed by the administrator and approved by us, therefore left the number of the apprentices to be determined in the administrator's discretion exercised in light of prevailing economic conditions. The contempt finding simply disregards this most pertinent history.
 
 
 120
 The record also demonstrates that the level of utilization of the apprenticeship program was consistent with existing economic circumstances. Although the majority notes a "dramatic" increase in average hours worked annually by a journeyman from 1975 to 1981, the number of journeymen in fact fell from 3,670 to 2,163 in roughly the same period. Even with this enormous decline in journeymen, the average number of forty-hour weeks worked by a journeyman in a calendar year was as follows:
 
 1970--52
 1971--51
 1972--35
 1973--31
 1974--28
 1975--26
 1976--25
 1977--26
 1978--31
 1979--37
 1980--42
 
 121
 Emphasis has also been placed upon the fact that the unemployment rate among apprentices has declined. However, during 1974 and 1975, when that unemployment rate was 20% and 40% respectively, large numbers of apprentices left the program when relatively full employment was not offered. As a consequence of that experience the administrator reduced the size of the 1977 apprenticeship class.[6] Had he not reduced the number of apprentices and thereby reduced apprentice unemployment, the high dropout rate would have made it impossible to increase significantly the percentage of minority journeymen.
 
 
 122
 Moreover, calculating the hours worked by apprentices as a percentage of total hours worked by both journeymen and apprentices indicates that the apprentices' share of total hours worked actually doubled from 1977 to 1981. Since every apprenticeship class after entry of the O & J and RAAPO began with at least 45% minority workers and since the share of work allocated to apprentices has dramatically increased, there is absolutely no basis for the claim of apprenticeship underutilization once prevailing economic circumstances are taken into account.
 
 
 123
 The majority opinion at two points implies that the differences between us stem from "uncertainties" regarding the utilization of the apprenticeship program resulting from the union's failure to file required reports. I do not share any such uncertainties. In fact, the record contains voluminous data with regard to the admission of apprentices. See notes 3 and 5, supra, and accompanying text.
 
 
 124
 Finally, the so-called standard 4:1 ratio of journeymen to apprentices is little more than a nationwide desideratum repeated every fifteen years or so by Department of Labor periodicals. Even simple mathematics, however, reveals that such a ratio can be maintained only in a growing industry. Its use is thus also subject to prevailing economic conditions.
 
 
 125
 For these reasons, there has not been a "clear and unambiguous" order of which there is "clear and convincing" evidence of non-compliance, prerequisites to a contempt judgment. Powell v. Ward, 643 F.2d 924, 931 (2d Cir.) (per curiam), cert. denied, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981). The frustration of the plaintiffs, the district court, and the majority at the union's failure to reach the judicially mandated racial balance even while complying with the O & J and RAAPO is perhaps understandable. However, in light of the facts that large numbers of journeymen did not work during the period in question or worked only meager hours, reactive finger pointing at Local 28 is a faintly camouflaged holding that journeymen should have been replaced by minority apprentices on a strictly racial basis. This is at odds with Firefighters Local Union No. 1784 v. Stotts, --- U.S. ----, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), which rejected such a use of racial preference as a remedy under Title VII. Resort by a federal court to such a strict racial quota in circumstances such as this seems to me also to be of questionable constitutional validity. See Regents of the University of California v. Bakke, 438 U.S. 265, 287-320, 98 S.Ct. 2733, 2746-2763, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.).
 
 
 126
 I also disagree with the majority's affirmance of the establishment of the "education fund." The district court ordered the union to finance the fund as part of the contempt sanction without making factual findings as to the need for the fund. As stated by the court, the fund will be used to provide tutorials and counseling for first year minority apprentices, to finance various methods of reducing dropouts among minority apprentices, and to improve the curriculum at vocational and technical schools.[7] I do not quarrel with the potential usefulness of such a fund as social policy. However, its central factual premise seems to be the lack of qualified minority applicants able to enroll in and complete the apprenticeship program, an implicit finding by the district court that Local 28 has done all it reasonably could with regard to the training of minority apprentices. If a lack of qualified applicants exists--and if it does not, it is difficult to understand the purpose of the fund--the remedy is not to hold a private organization such as Local 28 responsible for improving the quality of public education in New York.
 
 
 127
 Many of the other claims of contempt also rest on a shaky foundation. For example, with regard to many of the alleged failures to comply with reporting requirements, Local 28 argued that the administrator had determined that it was not required or able to make such reports. The district judge rejected this argument on the grounds that the administrator had no power to grant such relief, a questionable ruling in light of RAAPO Sec. 15. Other claims of contempt are based on firmer grounds but do not warrant the extraordinary remedies invoked here. Only so much can be made, for example, of a use of first class rather than certified mail or an isolated issuance of work permits. (The majority surely makes the most of it in implying that 200 unauthorized permits were issued. The district court's finding was that 13 such permits violated the RAAPO.) The failure to undertake the publicity campaign followed the administrator's failure to respond to Local 28's request for advice on the content of the campaign in light of the limited apprenticeship spaces available. Since the administrator was to supervise the campaign under the terms of the RAAPO, the union's failure to go forward is rather less blameworthy than it seems to the majority. In any event, since each apprentice class had 45% minority membership, the lack of a publicity campaign seems inconsequential.
 
 
 128
 I would remand the case to the district court for a full reexamination of the contempt charges as well as of the newly revised affirmative action program. Regrettably the district judge failed to give careful scrutiny to the record or to the prior history of this case before reaching his conclusions. His legal and factual determinations with regard to the apprenticeship program were taken literally from the air and showed little understanding of what the O & J and RAAPO actually provide. This is evident in his disregard of the administrator's final authority as to the size of the apprenticeship program, and also in his failure to examine the administrator's rulings with regard to reporting requirements. The newly revised program approved by the majority imposes the same kind of hard and fixed numerical requirements as were found unrealistic in the AAPO, without any serious explanation of why they did not work before. Affirmance requires us to enforce the 29% goal as a fixed quota requiring the replacement of journeymen by apprentices on a strictly racial basis. Believing this to be inconsistent with our prior decisions in this matter and with Title VII itself, I dissent.
 
 
 
 [1]
 That paragraph reads:
 
 
 [14]
 In addition to the powers and duties specified in this Order and the Program, the Administrator shall be empowered to take all actions, including but not limited to the following, as he deems necessary and proper to implement and insure the performance of the provisions of this Order and the Program:
 (a) establish additional record-keeping requirements;
 (b) increase the frequency with which the apprentice entrance test and/or the hands-on journeyman's test described more fully infra are administered;
 (c) devise and implement additional methods and procedures for entry by non-whites into Local 28 or the Apprentice Program;
 (d) establish ratios of non-whites to whites by which individuals will be admitted to Local 28 or the Apprentice Program;
 (e) establish through the Program or otherwise such interim percentage goals of non-white membership in Local 28 and/or the Apprentice Program in order to insure that the 29% goal set forth in paragraph 11 supra is achieved by July 1, 1981;
 (f) establish procedures and practices for work referral and employment, including but not limited to work referral and employment procedures and practices based on ratios of non-whites to whites, furloughs and/or rotation;
 (g) conduct an investigation into, and/or require Local 28, and/or JAC to submit reports, concerning any aspect of the operation of Local 28 and the Apprentice Program;
 (h) review and approve or object to the disposition of all applications for entry into Local 28 or the Apprentice Program. At such time, if ever, that the Administrator shall adopt and implement any of the procedures and requirements authorized in this paragraph, he shall do so in writing and such procedures and requirements shall thereafter be deemed included in and part of the Program described infra and subject to review by the Court.
 
 
 [2]
 The AAPO, which was superseded by the RAAPO, called for: (1) the indenture of 100 apprentices in February, 1976, 200 in July, 1976, and 200 each year thereafter; (2) the rotation of apprentices through jobsites in order to equalize employment among apprentices; and (3) a ratio of one apprentice for every four journeymen
 None of these requirements were met because of an egregiously unfavorable economic climate described infra in the text. The JAC indentured only 53 apprentices in February, 1976, none in July, 1976, and 36 in all of 1977. In addition, the JAC stopped the rotation system on the grounds that too many apprentices were quitting the program. Nor was the ratio of one apprentice for every four journeymen observed. The Administrator was informed of these development by the JAC in a series of letters during the summer of 1976 and held a hearing on December 21, 1976. The EEOC later filed a motion to revise the AAPO. The result of the hearing and the motion papers was a report by the Administrator on the AAPO and promulgation of the RAAPO.
 In view of the unfavorable economic circumstances, no sanctions were imposed for a failure to comply with the AAPO. To the contrary, the February, 1977 apprentice class size was reduced from 100 to 36 and the size of future classes was to be determined in accord with the discretion of administrator pursuant to the procedure quoted in the text, supra. The verb preceding the rotation plan was changed from "shall" to "may" and the 4:1 ratio was dropped altogether as not workable.
 
 
 [3]
 Apprentice class sizes were reported by the JAC to the Administrator and the plaintiffs on April 6, June 2, June 18, 1976; March 4, April 4, May 9, June 8, July 13, August 3, September 7, November 7, December 7, 1977; January 6, February 27, April 11, May 15, June 6, July 6, August 4, September 12, October 6, November 3, December 4, 1978; January 10, February 13, March 14, April 4, May 9, June 14, August 16, September 18, October 19, November 21, December 14, 1979; January 21, February 22, March 17, April 23, May 23, June 17, July 23, August 7, September 10, October 9, November 12, December 16, 1980; January 21, February 18, March 10, May 5, June 9, August 3, August 6, September 17, October 13, November 13, December 9, 1981; January 11, February 8, March 22, April 7, May 10, 1982
 
 
 [4]
 That paragraph provides that the administrator shall hear and determine all complaints concerning the operation of this Order and the Program and shall decide any questions of interpretation and claims of violations of this Order and the Program, acting either on his own initiative or at the request of any party herein or any interested person
 
 
 [5]
 Enrollment after entry of the orders was as follows:
 1977 36
1978 49
1979 30
1980 77
1981 143
 Our decision affirming the RAAPO was rendered on October 18, 1977. The enrollment of 36 apprentices in 1977 was specified in the RAAPO itself.
 
 
 [6]
 See note 2 supra
 
 
 [7]
 The district judge's order reads in part:
 
 
 [6]
 The Fund shall be used for the following purposes:
 a. Establishing a tutorial program of up to 20 weeks duration for nonwhite first-year apprentices.
 b. Creating part-time and summer sheet metal jobs for nonwhite youths between the ages of 16 through 19 who are currently enrolled in or have successfully completed, within the past year, a sheet metal vocational or technical education program or a program in an allied trade requiring the use of tools, math or drafting, such as carpentry.
 c. Paying the expenses, including any lost wages, of nonwhite members and apprentices of Local 28 for their services as liaisons to vocational and technical schools having sheet metal programs. The duties of the liaisons shall include, but not be limited to the following: working with the schools to upgrade the sheet metal program, arranging trips to sheet metal shops and field sites, counseling the students on methods of entry into Local 28 and working with participants in the program set forth in paragraph 6(b) above. The JAC training coordinators and union officials shall cooperate fully with the liaisons in the effort to carry out this program.
 d. Appointing a counselor or counselors, whose duties shall include, but not be limited to, the following: monitoring the progress of nonwhite apprentices at each JAC school and on the job, providing nonwhite apprentices with personal and job-related counseling and assisting nonwhite apprentices in adjusting to their school and work environments to help ensure their successful completion of the Apprenticeship Program. The counselor(s) shall be selected and supervised by the Administrator subject to approval by plaintiffs and the Court. Defendants and all Local 28 contractors shall cooperate fully with the counselor(s). Every two months, and at the end of each apprenticeship term, the counselor(s) shall submit to the parties, the Administrator and the Court a report detailing the progress of nonwhite apprentices and setting forth recommendations to resolve any problems nonwhite apprentices may be encountering.
 e. Providing stipends to unemployed nonwhite apprentices while they attend their regular apprentice class and any additional classes that will be offered to such apprentices pursuant to the AAAPO.
 f. Establishing a low-interest loan fund for nonwhite first-term apprentices who demonstrate financial need.
 g. Providing stipends to unemployed nonwhite journeymen while they take advanced courses to upgrade their skills.
 h. Providing financial reimbursement to any employer who has demonstrated to plaintiffs' satisfaction that it cannot afford to hire an additional apprentice to meet the one-apprentice-to-every-four journeymen requirement of the AAAPO.
 i. Providing incentive or matching funds to attract additional funding from governmental or private job training programs, such as the Dislocated Worker Program established pursuant to Title III of the Job Training Partnership Act. 29 U.S.C. Secs. 1651-1658.
 j. Additional expenditures may be made from the Fund upon a showing by any party that such an expenditure would serve to increase the nonwhite membership of the union and the Apprentice Program, or to provide support services to nonwhites. The party submitting authorization for withdrawal of monies from the Fund must first circulate a written proposal to all other parties and the Administrator detailing the amount requested and how the money would be expended. If all parties agree to such a proposal or, if the parties cannot agree, and the Administrator determines that the proposal should be funded, the Administrator shall authorize the withdrawal of an appropriate amount from the Fund.