EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

LOCAL 580, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRONWORKERS, Joint Apprentice Journeyman Educational Fund ..., Allied Building Metal Industries, Inc., Defendants.

No. 71 Civ. 2877 (RLC).

United States District Court, S.D. New York.

Sept. 11, 1987.

E.E.O.C., Washington, D.C., for plaintiff; Sabrina Whitehead Jenkins, of counsel.

Kennedy & Casey, P.C., Garden City, N.Y., for defendants Local 580, International Association of Bridge, Structural and Ornamental Ironworkers, and Joint Apprentice Journeyman Educ. Fund; Robert A. Kennedy, of counsel.

OPINION

ROBERT L. CARTER, District Judge.

This action concerns race discrimination in the ironworker trade. It was brought by the United States in 1971, charging defendant Local 580, International Association of Bridge, Structural and Ornamental Ironworkers ("Local 580") with engaging in a pattern and practice of discrimination against blacks and Hispanics in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Local 580 is an unincorporated labor organization with its territorial jurisdiction consisting of New York City, and Westchester, Nassau, and Suffolk counties. The complaint charged Local 580 with discriminating in the recruitment, selection, training and employment of minorites who sought or had obtained membership in the local.[1]

On or about July 20, 1978, the plaintiff entered into a Consent Judgment with Local 580 and defendants Joint Apprentice-Journeyman Educational Fund of the Architectural Ornamental Fund of the Architectural Ornamental Ironworkers Local 580 ("AJEF") and Allied Building Metal Industries, Inc. ("Allied"). The AJEF is a joint management-labor organization that operates a training and educational program for Local 580 apprentices and journeymen. Allied is a corporate association of ironworker employers that acts as the employers' collective bargaining agent in negotiations with Local 580. The Consent Judgment permanently enjoined defendants from discriminating against any individual on the basis of race, color, religion, sex or national origin, and established an affirmative action plan with the expressed goal of creating 24 percent non-white membership in Local 580 by 1983.

On or about February 3, 1984, the Equal Employment Opportunity Commission ("EEOC"), which had been substituted for the United States as plaintiff, moved to

1. This action was originally part of a larger discrimination action brought against four unions in the building trades industry and their joint management-labor apprenticeship committees. After issue was joined, the cases were severed for trial. *See EEOC v. Local 638 ... Local 28 of the Sheet Metal Workers' Int'l Ass'n,* 401 F.Supp. 467, 471 & n. 2 (S.D.N.Y.1975), *aff'd as modified,* 532 F.2d 821 (2d Cir.1976).

hold Local 580 and AJEF in contempt of the Consent Judgment. The case is presently before the court following a four-day evidentiary hearing concerning discrimination in the apprentice program.

## BACKGROUND

Successful completion of the apprentice program is the principal means of attaining membership in Local 580.[2] To insure increased minority participation in the apprentice program, the Consent Judgment not only enjoins the defendants from engaging in any discriminatory acts[3] but imposes upon them affirmative obligations designed to attract minority candidates and produce minority graduates. Under the Consent Judgment, the defendants must publicize the apprentice program by informing a list of organizations with ties to minority communities when an apprentice class will be formed and when an entering test will be given. Consent Judgment, §§ III.14; V.2 (unless otherwise indicated, all subsequent section references refer to the Consent Judgment). The Consent Judgment provides that the test is to be comprised of oral, medical, and physical components, as well as a written "aptitude" component, provided that this latter component is "validated" under EEOC Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607. § III.E.17.(i).

Like all apprentices in New York State, ironworker apprentices must be "indentured" with the State Department of Labor ("NYSDOL") before they begin the apprentice program. The Consent Judgment requires the AJEF to indenture "at least" 30 apprentices per year. § III.13–14.

The Consent Judgment requires the defendants to provide apprentices with educational training and "daily on-the-job work experience." § III.19(d). The apprentices primarily receive job assignments from the Local 580 "Referral Hall" on a first-come, first-served basis determined by how many consecutive days they have waited in the hall.

Finally, to insure compliance with these provisions, the Consent Judgment imposes on Local 580 and the AJEF a duty to record and provide to the EEOC information regarding virtually every aspect of the apprentice program. *See* §§ III.E.22, IV. Toward the same end, the Consent Judgment provides this court with continuing jurisdiction over the action and allows any party to apply to the court to obtain additional orders to insure "the full and effective implementation of the terms and intent of this judgment." § VI.1.

The EEOC's February, 1984 motion for contempt alleged violations of virtually ev-

---

**2.** The other means by which journeymen may obtain membership in Local 580 are (i) a passing grade on journeyman tests previously administered under a state consent decree; (ii) a passing grade on a post-Consent Judgment journeyman test; (iii) transfer from another ironworking local in accordance with provisions of Local 580's constitution; and (iv) employment in a non-union shop at a time when Local 580 organized the shop. *See* Consent Judgment, § III.B.4.(a) (unless otherwise indicated, all subsequent section references refer to the Consent Judgment).

**3.** The Consent Judgment provides in part that:

Local 580, its officers, agents, employees, members or other persons engaged in the administration of the affairs of Local 580 as well as their successors, and all persons in active concert or participation with any of them, are permanently enjoined from engaging in any act or practice which has the purpose or the effect of discriminating in recruitment, selection, training, admission to membership in Local 580, admission or indenturing to membership in the Apprentice Program, or terms, conditions or privileges with

respect thereto against any individual or class of individuals on the basis of race, color, religion, sex or national origin.

Local 580, its officers, agents, employees, members or other persons engaged in the administration of the affairs of Local 580 as well as their successors, and all persons in active concert or participation with any of them, shall not exclude nor expel any individual from membership in Local 580 or fail or refuse to refer an individual for employment with any employer, on the basis of race, color, religion, sex or national origin nor engage in any other act or practice which has such discriminatory purpose or effect; nor shall they take any other action which would deprive or have the effect of depriving any individual of employment opportunities with any employer in obtaining compensation, in working conditions or privileges or in advancement or otherwise adversely affect his status with Local 580 because of such individual's race, color, religion, sex, or national origin.

§§ II.1, 2 (footnote omitted). *See also* § II.4.

ery substantive provision of the Consent Judgment. From the outset, it was clear that these issues would not be resolved easily, and certainly not by agreement of the parties. Much of this difficulty was attributable to the intransigence of Local 580 and AJEF, who refused to provide the EEOC with information they were required to provide pursuant not only to the Consent Judgment but to appropriate discovery requests as well. Indeed, even in conference with the court "it was clear that ... defense counsel was engaged in delaying tactics...." *EEOC v. Local 580,* No. 71 Civ. 2877, slip op. at 1 (S.D.N.Y.May 31, 1985) (Carter, J.) [Available on WESTLAW, DCT database]. To coerce defendants into providing requested documents, the court was forced to resort to the threat of fines and other measures. *See id.* at 9–10.

After substantial discovery, the EEOC moved for contempt on its papers.[4] The court informed the parties in conference that the issues raised would have to be addressed in an evidentiary hearing. After the EEOC denominated the topics it wished to address at a hearing, Letters from Sabrina Whitehead Jenkins to the Court (Mar. 3, Apr. 6, 1987), the court refined and summarized those topics for the parties as follows:

(1) The defendants' alleged failure to validate the apprenticeship examination.

(2) The defendants' alleged failure to maintain fifty percent minority participation in the apprenticeship program.

(3) The defendants' alleged discriminatory or improper recruiting and admission practices.

(4) The defendants' alleged discrimination against and harassment of minority participants in the apprenticeship program.

(5) The defendants' alleged failure to provide minority apprentices with job and referral opportunities.

(6) The defendants' alleged failure to comply with provisions of the Consent Judgment that require them to record information and provide information to the EEOC.

Letter from the court to Robert A. Kennedy, Esq., Sabrina Whitehead Jenkins, Esq. and Harold R. Bassen, Esq. (Apr. 22, 1987).

In addition, the court requested the parties to address whether the Consent Judgment should be amended to eliminate a still-unvalidated aptitude test that has been used since 1978, and whether a Special Master should be appointed to oversee the case pursuant to Rule 53, F.R.Civ.P. *Id.*

The hearing was held from June 9 to June 15, 1987. On the basis of the evidence presented, the EEOC moves to hold defendants AJEF and Local 580 in contempt[5] and, in a detailed proposed order annexed to its post-trial briefs, seeks as a remedy: an expanded recruitment campaign; the elimination of the aptitude test and the development of an alternative selection mechanism; amendments to the system by which apprentices receive work opportunities; "make whole" relief for those individuals discriminated against; and the appointment of a Local 580–funded administrator or special master.

■ The defendants oppose any changes to the Consent Judgment. While they acknowledge noncompliance with certain provisions, they argue that their transgressions either have not been material or are excused by factual impossibility.[6]

---

**4.** That motion, which the Equal Employment Opportunity Commission ("EEOC") styled as one for "summary judgment" pursuant to Rule 56, F.R.Civ.P., is hereby denied. The court will address the issues the EEOC raises in that motion with respect to the apprentice program in the instant opinion, and will address the other issues only after an evidentiary hearing on those issues has been held.

**5.** The EEOC also seeks to find the defendants in breach of a collective bargaining agreement and guilty of failing to represent minority apprentices. *See* Plaintiff's Memorandum at 23. As these issues were not included among those specifically enumerated for consideration at the hearing, they are not properly before the court and will not be considered.

**6.** The defendants also argue as an alternative defense that plaintiff's claims are barred by laches because the EEOC allowed five years to pass between the time the Consent Judgment was entered and the time the EEOC filed its original motion for contempt. The court has already had occasion to reject this argument, *see EEOC v. Local 580,* No. 71 Civ. 2877, slip op. at 5–6 (S.D.N.Y. May 31, 1985) (Carter, J.) [Avail-

## DISCUSSION

### I. APPLICABLE LAW

■ The defendants may be held in civil contempt for failure to comply with an order of the court if the order is " 'clear and unambiguous, the proof of noncompliance is "clear and convincing," ' and the defendants have not 'been reasonably diligent and energetic in attempting to accomplish what was ordered.' " *EEOC v. Local 638 ... Local 28 of the Sheet Metal Workers' Int'l Ass'n*, 753 F.2d 1172, 1178 (2d Cir.1985), *aff'd*, —— U.S. ——, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) (citation omitted).[7] "It is not necessary to show that defendants disobeyed the ... court's orders willfully," *id.*, although a "party may defend against a contempt by showing that his compliance is 'factually impossible.' " *Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir.1986) (quoting *United States v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983)). In raising this defense the defendant has a weighty burden of production that "may be difficult to meet," especially "where the defendants have a long history of delay and the plaintiffs' needs are urgent." *Badgley, supra*, 800 F.2d at 36.

If a party is found to be in contempt, sanctions may be ordered " 'to coerce [it] into compliance with the court's order, and to compensate the complainant for losses sustained.' " *Local 28, supra*, —— U.S. at ——, 106 S.Ct. at 3033 (citation omitted). In a discrimination action the " 'societal interest in compliance with the judgments of the federal courts' " is supplemented " 'by the governmental interest in eradicating ... discriminatory practices." *United States v. Paradise*, —— U.S. ——, ——, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987) (quoting *Local 28, supra*, —— U.S. at ——, 106 S.Ct. at 3055 (Powell, J. concurring in part and concurring in the judgment)). As a result, the court may employ the equitable discretion it gains from the continuing jurisdiction provisions of the Consent Judgment, *see Local 28, supra*, 753 F.2d at 1185, as well as the court's "broad power ... to fashion 'the most complete relief possible' to remedy past discrimination." *Local 28, supra*, —— U.S. at ——, 106 S.Ct. at 3035 (citations omitted). In determining whether and if so which, race-conscious remedies are appropriate, the court must consider several factors

> including the necessity for the relief and the efficacy of alternative remedies, the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties.

*Paradise, supra*, —— U.S. at ——, 107 S.Ct. at 1067 (citing, *inter alia, Local 28, supra*, —— U.S. at ——, 106 S.Ct. at 3050–53).

Before proceeding to the allegations before the court, it is worth noting that the

---

able on WESTLAW, DCT database]. As was true in the related action involving Local 28, "although plaintiffs may have been in the best position to bring defendants' violations to the attention of the district court, it was the defendants who were charged with reasonable diligence and making energetic efforts to comply with the orders of the court. Their attempt to shift the onus of inactivity to plaintiffs is misguided." *EEOC v. Local 638 ... Local 28 of the Sheet Metal Workers' Int'l Ass'n*, 753 F.2d 1172, 1179 (2d Cir.1985), *aff'd*, —— U.S. ——, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986). Moreover, as in the *Local 28* case, plaintiff has not been silent but, to the extent that it has been able to learn of the defendants' noncompliance, it has sought remedial action. *See id.*

**7.** Although the EEOC has moved to hold the defendants in criminal as well as civil contempt, the allegations complained of, and more impor-

tant, the remedies sought, are more appropriately addressed in civil contempt proceedings. *See Local 28, supra*, —— U.S. at ——, 106 S.Ct. at 3033. Criminal contempt sanctions are "punitive in nature and are imposed to vindicate the authority of the court." *Id.* Civil sanctions, on the other hand, are imposed " 'to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.' " *Id.* (citation omitted). Although defendants are clearly in contempt by any standard, the court believes no purpose would be served by punishing them for their transgressions. At this point, it is far more important to order remedial relief that will bring defendants into compliance with the Consent Judgment and foster equal opportunity for minorities who wish to be or presently are apprentices.

court has the decision of the United States Supreme Court and the numerous decisions of the Court of Appeals for the Second Circuit and Judge Werker in *EEOC v. Local 638 ... Local 28 of the Sheet Metal Workers' Int'l Ass'n* as helpful sources for an appropriate resolution of this controversy.[8] The *Local 28* case, which involves race discrimination in the sheet metal trade, was originally consolidated with the case against Local 580 as part of a concerted effort on the part of the United States to eliminate discrimination in the building trade.[9] The *Local 28* action, which was severed for trial, has been the focus of far more litigation activity than the *Local 580* case. Since the two cases involve many similar issues, *Local 28* provides an unusually helpful source of authority.

Like the ironworker union at issue in this case, the sheet metal union before the courts in *Local 28* had traditionally relied on nepotism in its membership process. The local had very few minority members, and had actively worked to keep minority membership to a minimum. To remedy the past discrimination, Judge Werker entered an order which, like the consent judgment in this case, enjoined the defendants from further discriminatory acts and established an affirmative action plan with the goal of increasing minority membership in the local to the percentage of minorities in the relevant labor pool. The local and the joint apprenticeship committee were directed to, *inter alia*, conduct extensive recruitment and publicity campaigns aimed at minorities, to administer new admission tests annually, to select apprentices on a white-nonwhite ratio to be negotiated by the parties, and to maintain detailed membership

records. An administrator was appointed to oversee the program.

Even after the entry of Judge Werker's order, however, the defendants continued to discriminate against minority apprentices by underutilizing the apprentice program, refusing to conduct the recruitment and publicity campaigns, issuing unauthorized permits to white workers from sister locals, administering a discriminatory apprentice exam and failing to maintain records. To remedy these abuses, the defendants were ordered to provide the administrator with a $150,000 fund which he was to use to increase minority participation in the local. The apprentice exam was eliminated and admissions decisions were instead to be made by a three-member selection board, composed of one representative each from the plaintiffs, the defendants, and the court. To prevent the local from underutilizing apprentices, the defendants were required to assign one apprentice for every four journeymen. *See Local 28, supra,* —— U.S. at ——, 106 S.Ct. at 3026–31. The district court's order was upheld in all substantial respects.[10] *Id.,* —— U.S. at ——, 106 S.Ct. at 3054; 565 F.2d at 36; 532 F.2d at 833.

The *Local 580* case involves strikingly similar allegations of discrimination, and, as will be set forth in greater detail below, requires many similar remedial measures. To analyze the issues in proper context, it is appropriate to review the allegations of discrimination and the required remedial action in the order that these issues arise in the program: that is, from recruitment,

---

**8.** *See* —— U.S. ——, 106 S.Ct. 3019 (1986); 753 F.2d 1172 (2d Cir.1985); 565 F.2d 31 (2d Cir. 1977); 532 F.2d 821 (2d Cir.1976); 421 F.Supp. 603 (S.D.N.Y.1975) (Werker, J.); 12 Fair Empl. Prac.Cas. (BNA) 733 (S.D.N.Y. Sept. 2, 1975) (Werker, J.) (order and judgment); 401 F.Supp. 467 (S.D.N.Y.1975) (Werker, J.).

**9.** *See* note 1, *supra.* The *Local 28* case, like the Local 580 case, was reassigned to me after Judge Werker's death and remains pending on my calendar.

**10.** The only material and relevant reversal of Judge Werker's order was the Second Circuit's

rejection of a one-to-one minority/non-minority admissions requirement to which the parties had agreed pursuant to Judge Werker's order. *See Local 28, supra,* 532 F.2d at 831. The Second Circuit's holding, however, must now be read in conjunction with the United States Supreme Court's decision this term in *United States v. Paradise,* —— U.S. ——, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (affirming one-to-one requirement as interim measure until defendant creates non-discriminatory promotion procedures). *See* text and accompanying notes at section II, *infra.*

testing and selection to job referral, in-school training and harassment.

## II. ADMISSIONS

### A. RECRUITMENT

■ The Consent Judgment contains two provisions designed to publicize the apprentice program in minority communities and to attract minority applicants. In § V.2, the Consent Judgment requires that:

Local 580 shall advise each organization listed in Exhibit K in writing with a copy to counsel for EEOC, on at least sixty (60) days' notice, when a journeyman or apprenticeship test is to be given; it shall therein specify the date, time, nature of test and location where said test will be given; and it shall state where and by what procedure application forms for each such test may be obtained. Local 580 shall also supply a reasonable number of application forms for the test(s) to be given to the organizations listed on Exhibit K.

In § III.E.14, the Consent Judgment further requires that "[w]hen it has been established that a[n] [apprentice] class is to be formed, the AJEF office of Local 580 shall notify ... all those listed in Exhibit K ... of the anticipated formation of this class." [11] The organizations listed in Exhibit K include public agencies, newspapers with a large minority readership, and minority groups. *See* Exhibit K.

Kenneth W. Cody, the coordinator of the apprentice program for Local 580, testified that Local 580 mailed notices to all the Exhibit K organizations announcing the upcoming formation of an apprentice class before each recruitment (Trial Transcript ["Tr."] 815), although some of the notices he sent out were returned stamped "address

[sic] unknown." (Tr. 170).[12] Mr. Cody "think[s]" "there was some communication sent to EEOC" informing it of Local 580's inability to reach certain organizations. *Id.* Local 580 contends that this effort complies with the Consent Judgment provisions quoted above.

Even taking Mr. Cody's testimony as true, the Union failed to comply with § V.2, which requires it to send copies of all Exhibit K notices to the EEOC and to send "a reasonable number" of application forms to the Exhibit K organizations. *See* (Tr. 815–20; 584). Moreover, Mr. Cody all but acknowledged that the defendant failed to make a reasonably diligent effort to contact organizations (or the EEOC) when mail was returned.

The evidence the EEOC presented at the hearing cast overwhelming doubt on defendants', and in particular Mr. Cody's claims of compliance. The court finds that many Exhibit K notices were never sent, or if they were sent, were negligently addressed. For example, one Exhibit K organization Mr. Cody acknowledges never having contacted was the well-known Bedford-Stuyvesant Restoration Corporation ("Bed-Stuy Restoration"). Mr. Cody testified that he believed notices to Bed-Stuy Restoration were returned "address [sic] unknown." (Tr. 170). Deborah Finch, legal counsel for Bed-Stuy Restoration, testified that the organization has continually been in existence at the address properly listed in Exhibit K, that she would have known if any notice had been received, that she could remember no such notice having been received, and that a thorough review of her files confirmed her conviction that no such notice was received. (Tr. 230–33).

11. Section III.E.22 requires the AJEF to maintain a record of all notices sent to Exhibit K organizations. The AJEF does not dispute that it has failed to comply with this record-keeping requirement. In this instance, like many others, the AJEF's failure to comply with its record-keeping obligations makes determining its compliance with substantive obligations difficult.

12. Local 580 has attempted to introduce further evidence of notices it allegedly sent to Exhibit K organizations. *See* Defendants' Memorandum,

Exhs. A, B. Even if this evidence was convincing, it could have been but was not introduced at the hearing and is not properly before the court. At this juncture it is worth noting that both parties rely, heavily in certain instances, on material that was never docketed with the court and not introduced at the hearing. In light of the ample opportunity all parties had to introduce evidence of any kind at the hearing, any material not introduced and not previously docketed with the court will not be considered.

Similarly, Catherine Silverman, Director of the Federal Contracts Unit of the New York State Division of Human Rights, another Exhibit K organization, testified that her organization also never received notices from Local 580. She too came to that conclusion not only on the basis of what she remembered, but as a result of a thorough review of her files. (Tr. 243).

Further evidence of noncompliance was offered by Ann MacNamara, General Counsel of the New York City Department of Employment, another Exhibit K organization. Ms. MacNamara, who has been an attorney at the Department of Employment since 1974, and its general counsel since 1977, testified that she would have known if the organization had received any notices from Local 580, and that none was received. She testified that she checked her files thoroughly to verify her recollection. (Tr. 248).

· The defendants' failure to comply with the clear and unambiguous provisions of the Consent Judgment requires the following remedial action:

First, the defendants [13] must develop a brochure describing the ironworking trade, the apprentice program, and the opportunities for minorities created by the Consent Judgment. The brochure must be approved by the special master (to be appointed pursuant to this opinion, *see* section III, *infra*). On or about 160 days prior to the formation of a class, the defendants are to send a substantial quantity of copies of the brochure, as well as apprentice program application forms, to all the organizations listed in Exhibit K, additional organizations including the vocational and technical schools listed in the forthcoming order, and any other organization which requests the material.

Second, the defendants shall place advertisements in all of the newspapers listed in the forthcoming order explaining the apprentice program and noting the formation of an apprentice class. The advertisements shall run no fewer than seven days in each of the four months preceding the formation of an apprentice class.

Third, the AJEF shall request that the radio stations listed in the forthcoming order run public service announcements describing the apprentice program and announcing the upcoming formation of a class. The defendants shall request such announcements on or about 120 days prior to the formation of an apprentice class, and shall request as many announcements as the radio station will provide.

Finally, to verify that such actions are taken, the defendants shall send copies to the EEOC of the covering letter accompanying all brochures sent to all recipients on or about 110 days before the formation of an apprentice class. Furthermore, on or about the day on which an apprentice class is formed, an officer or senior administrator of AJEF and a similar official of Local 580 shall each file with the special master, with a copy to the EEOC, a sworn notarized statement detailing all actions his organization has taken to recruit minority apprentices.

## B. OBTAINING APPRENTICE APPLICATIONS

██ Even those minorities who learned of the apprentice program had difficulty obtaining and submitting applications. The applications were available and had to be submitted during a one-month period for each recruitment (i.e. every two or three years). Applicants were required to submit applications in person to an apparently unmarked room on the 17th floor of the building housing the Local 580 offices. If a prospective applicant sought an application at any time other than during the 30–day application period, the AJEF's policy was to give him an index card to fill out with his name and address and to advise him that the AJEF would contact him when applications were available. (Tr. 821–24).

**13.** Because both defendants have breached recruitment obligations under the Consent Judgment, both will be held accountable for future compliance with the recruitment provisions of the Consent Judgment as well as those remedies relating to recruitment ordered pursuant to this opinion.

The limited period during which the applications were available and the requirement that applications were to be personally delivered to an obscure office certainly were not designed to encourage, and did not have the effect of encouraging, applications from minority applicants. The Consent Judgment, as noted above, enjoins all defendants from engaging in any act or practice which has the "purpose or effect" of discriminating against minorities in the recruitment or selection of apprentices. *See* §§ II.1, 2, 4. Once again, even taking the AJEF at its word, it is in violation of the Consent Judgment.

The evidentiary hearing, moreover, indicated that barriers above and beyond facially neutral institutional policies barred or deterred prospective minority apprentices. Gary Cooper, a young black prospective applicant, testified that in 1981 he went to the Local 580 offices to apply for an apprentice position. He walked into the office right behind a white man. The white man asked for an apprentice application, and was "buzzed" into the office, where Mr. Cooper—looking through a glass partition—observed him filling out an application. Mr. Cooper said he was sure of how to request the application only by repeating what the white man who preceded him into the office had said. Mr. Cooper's identical request, however, did not result in his admission to the offices or receipt of an application. Instead, he was given an index card on which he was to write his name and address so that he could be contacted about future tests. He did not, however, hear from the AJEF until 1986, after the EEOC had intervened on his behalf. (Tr. 427–30). Mr. Cooper testified that this experience had left an indelible imprint on him. He testified that "when I walked out of that office, for the first time I really felt black and really felt [what it is] like being black and discriminated against." (Tr. 431).

Mr. Cooper's experience apparently was not anomalous. Keith Johnson, another black prospective applicant, testified that when he sought to apply for the apprentice program in 1981 he was also given an index card to fill out. Mr. Johnson was further told that a prerequisite for admission into the apprentice program was possession of a valid "New York City Certificate Class One license." (Tr. 444). No such requirement exists.[14]

Similarly, Kenneth Phillip, another prospective minority applicant, filled out an index card in 1982. He was then contacted and asked to submit more personal data than he originally had provided. He complied, but did not hear from the AJEF until June, 1984, when he received a letter informing him that he would be notified of an upcoming apprentice exam. That was the last he heard from the AJEF. (Tr. 437–39).[15]

To remedy the difficulties minorities have experienced obtaining applications, henceforth Local 580 and the AJEF must *both* maintain and distribute from their offices application forms at all times free of charge to any individual or organization requesting them. Completed applications may in the future be submitted by mail or in person within a specified 120–day period annually. To insure that all applications are duly processed, the application shall include a "tear-off" prestamped postcard addressed to the EEOC on which the applicant must list his name, address and race and which he must mail simultaneously with his application.[16]

---

**14.** Johnson subsequently was informed of and took the 1983 apprentice examination. He received a score of 80.2, which placed him # 191 on the admissions list. He was not accepted into the program. When he went to the AJEF office later in 1983 to inquire about his application, William Nulti, a Local 580 business agent, informed him that he couldn't be a member of the union because of this lawsuit. (Tr. 450).

**15.** Other minorities experienced difficulties of a different sort. The Consent Judgment requires applications to the apprentice program to be accompanied by a $30 non-refundable fee. § III.E.17(e). Jose Acevedo and Marvin Washington both testified that they were required to pay a $30 fee to *obtain* an application. (Tr. 533–34; 547–48).

**16.** This remedy in many ways resembles a letter-agreement entered into by the United States and Local 580 before the Consent Judgment was entered. Under the terms of that agreement, applications would have also been made more readily accessible. *See* Letter from Assistant United States Attorney Dennison Young, Jr.,

## C. SELECTION

The Consent Judgment provides that apprentices are to be selected on the basis of oral, written, medical, and physical examinations. Before turning to an analysis of whether the tests themselves are discriminatory and whether they are sufficiently job-related to warrant retention, it is appropriate to review the EEOC's allegations of discriminatory conduct by defendants during the nine-year period while validation of the aptitude test has been pending.

### 1) Selection Pending Validation of the Aptitude Test

■ The Consent Judgment provides for use of an aptitude test "provided that such test is developed and validated [by the United States Department of Labor ("US-DOL")] under EEOC Guidelines on Employee Selection Procedures, 29 C.F.R. Part 1607...." § III.E.17.(f).(i).

When the Consent Judgment was entered, it was recognized that validation of an aptitude test would not be immediate. As a result, the Consent Judgment provided that the SATB–280 exam could be utilized for the 1978 recruitment. § III.E.17.(f).(i)n*. The Consent Judgment further provided, however, that in the interim, Local 580 and AJEF were to cooperate with the USDOL in its efforts to validate the test, provided that the authority to use the test "shall in no way alleviate Local 580 of its obligation to insure that the [affirmative action plan] goals for non-white membership ... are met." *Id.* The Consent Judgment further provided that "Local 580 and AJEF shall ensure that the number of minorities in the apprentice class to be inden-

tured in February/March 1978 and in future classes reflects Local 580's intention and obligation to ensure that the [affirmative action plan] goals for non-white membership ... are satisfied." *Id.*

The evidence introduced at the hearing made clear that defendants engaged in a two-pronged discriminatory policy with respect to the apprentice program. First, they underutilized the apprentice program; then, to the extent possible, they insured that those who actually participated in the program were white. Both aspects of the policy violated the Consent Judgment. *See* §§ III.E.17.(i); II.1, 2, 4.

The Consent Judgment requires that the AJEF "indenture" "at least 30 apprentices" each year. § III.E.13. Although the AJEF apparently indentured 30 apprentices per year, it did not replace many indentured apprentices who did not actually start the program. Thus, in the nine years the Consent Judgment has been in effect, the number of apprentices actually participating in the program has reached 30 only once, and in some years has been as low as 20. *See* Exh. 70. The small class size cannot be attributed to any lack of qualified potential apprentices. Many minority apprentices testified and the evidence established that many applicants received passing scores on the test but were never admitted into the program. *See, e.g.,* testimony of Steven Dennis (Tr. 372–75); Daphne Ellison Jackson (Tr. 387–91); Ricardo Herbert (Tr. 395–96).[17] This policy has had the effect of limiting opportunities to minorities in the *means* of attaining Local 580 membership most carefully monitored by the court and the EEOC.[18]

---

Esq. to Richard L. O'Hara, Esq. (Apr. 17, 1978). The parties are in disagreement over whether this letter was superseded by the Consent Judgment. The court need not reach this issue to allow the relief ordered today.

**17.** This points to another problem in the admissions process uncovered at the hearing. The AJEF administered tests in 1978, 1980 and 1983. By its own concession, it was not supposed to administer a new test until it has exhausted the list of apprentices who had passed the previously administered test. Several minority apprentices testified that they received passing scores on the 1980 test but were never contacted by the

AJEF before it administered the 1983 test, and are still interested in the program. *See* testimony of Daphne Ellison Jackson (Tr. 390–91); Ricardo Herbert (Tr. 396).

**18.** The conscious underutilization of apprentices is further evidenced by the wide use of "dobey men" in Local 580's jurisdiction. Dobey men are journeymen from Local 580's sister locals transferred by employers to construction projects within Local 580's jurisdiction. *See* § II.3.n.*. An exact account of the use of dobey men is difficult to determine, largely because of defendants' spotty and contradictory record keeping (Tr. 670–90 *passim*), but it is clear that

The opportunities foreclosed to minorities by small class sizes were compounded by the fact that 68 percent of all apprentice drop-outs were replaced by whites. *See* Exh. 69. The testimony established that many minorities were discouraged from remaining in the program by the high initiation fees unilaterally imposed on indentured apprentices. The Consent Judgment allows the AJEF to charge a $150 initiation fee. § III.E.21(a). The AJEF unilaterally raised this fee to $250, and also charged the entering apprentice two months' dues up front (the monthly dues have ranged from $9–14). (Tr. 208–10). Moreover, the testimony established that the fees were specifically used to eliminate minorities from the program. For example, when Jose Acevedo, a young Hispanic, accepted an offer to join the program but did not have the required initiation fee, he was immediately replaced by a white alternate. (Tr. 535–41).

In the classes indentured since 1983, the defendants' discriminatory admission practices have been in violation not only of the Consent Judgment, but of a court-ordered stipulation designed to insure nondiscriminatory admissions. After the USDOL was unable to validate the aptitude test in 1983,[19] the parties entered into the stipulation, which provided that the AJEF could continue to administer the test provided that it admitted one minority for each non-minority admitted into the apprentice program.

The defendants do not dispute that fewer than 50% of the apprentices who actually began the program were minorities, but they argue that they fulfilled their duty under the stipulation by *indenturing* "50/50" classes. Defendants' Memorandum at 11–12. This argument strains credulity. It is in derogation of the spirit if not the text of the court-ordered stipulation, and of the above-quoted provisions of the Consent Judgment requiring the defendants to ensure the attainment of the non-white membership goal while validation remained pending. *See* § III.E.17.(f).(i)n*. The clear purpose of the 50/50 split was to offset any adverse discriminatory impact caused by continued administration of the SATB–280. That goal was not furthered in any respect by increasing the number of minority apprentices indentured. The only relevant statistic was the number of minority apprentices who actually participated in the program and would eventually become members of Local 580.[20]

## 2) The Test Itself

As noted above, the Consent Judgment requires that an applicant must pass a battery of physical, medical, oral, and aptitude tests in order to be admitted into the ap-

they have been allowed to work in far greater numbers than contemplated by the Consent Judgment. The Consent Judgment allows 13 specific dobey men to work within the jurisdiction and requires court approval for any others. *Id.* Dr. Harriet Zellner, plaintiff's expert, conservatively estimated that dobey men accounted for between 3.25% and 5.08% of journeyman hours worked in Local 580's jurisdiction. *See* Exh. 104. The defendants contend that this evidence is irrelevant because dobey men do journeyman, rather than apprentice work, but it is obvious that the number of apprentices admitted into the apprentice program is—or at least should be—determined by employment opportunities for Local 580 journeymen. Thus, the use of dobey men has the effect of limiting the number of apprentices allowed into the AJEF apprentice program.

**19.** The EEOC contends that the defendants misrepresented the status of the validation study. Although the evidence indicates inordinate delay in informing the EEOC that the first vali-

dation study was unsuccessful, it is impossible to determine on the evidence presented who is responsible. Although the validation study was completed in 1981, *see* Exh. 97, Local 580 contends it was not informed of the result until April of 1983, when it promptly informed the EEOC. Local 580's position is supported by an April 3, 1983 letter from the New York State Department of Labor ("NYSDOL") to Local 580, informing Local 580 of the result. More important, annexed to the letter is the report of the Michigan Department of Labor, which conducted the validation study. This report, although dated April 9, 1981, bears NYSDOL's "date received stamp" of March 15, 1983. *See id.*

**20.** It should be noted that the stipulation did have the effect of drastically increasing the number of minority apprentices participating in the program. Between 1978 and 1982 only 40 of 131, or 30.5%, of all apprentices were minorities. Between 1983 and 1986 51 of 107—or 47.7%—of all apprentices were minorities.

prentice program. The hearing established no problems with the medical and physical tests, but revealed significant infirmities in the oral and written tests. These infirmities were so grave that, taken as a whole, it is clear that the tests as administered have constituted an arbitrary mode of selection based on criteria that bear no significant relevance to successful ironworking. Moreover, the hearing, in conjunction with previously docketed submissions, definitely established that the written portion of the test discriminates against minorities in violation of Title VII.

The irrelevance of the test is perhaps most conclusively demonstrated by the wide variation in scores which defendants have demanded of successful applicants to the apprentice program and the absence of any correlation between high scores and successful completion of the program. Under the Consent Judgment, an applicant may score a total of 100 points on all tests: 35 points on the aptitude test, 25 on the oral portion, and 30 on the physical portion. In addition, an apprentice receives 5 points for each of his first two years of military service, if any.[21] However, while the defendants consider 70 a "passing score," the scores that an applicant had to receive to actually participate in the program varied wildly: In some years a score of 94 was not sufficient to gain admission, while in other years it was drastically reduced. In 1979, for example, a score of 23.7 would suffice. *See* Exh. 1; (Tr. 872). No fewer of these 1979 apprentices failed to graduate from the program than apprentices in other years, which is itself sufficient evidence of the tests' irrelevance to warrant their elimination. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) (fact that employees who failed to meet educational or testing requirements are good employees is evidence of requirements' irrelevance).

The tests also suffered from a scoring system that inevitably led to arbitrary results. The evidence at the hearing definitely established that *in any particular class* a few points have made the difference between those candidates accepted and those rejected. For example, a score of 86.2 placed Ricardo Herbert # 117 on the list of eligible applicants. Steven Dennis, a black applicant, was told that he would have to flip a coin with a white applicant with an identical score to secure the 29th and final spot in the class. He lost. (Tr. 872). Yet, despite the importance a few points have made, the written test, which accounts for the greatest number of points (35) an applicant can receive, is scored in an extremely crude manner: The NYSDOL grades the tests "high," "medium," or "low," and the AJEF assigns a high test 35 points, a medium test 17½ points, and a low test no points. Thus, a few answers, or perhaps a single answer, on the written test often make the difference between acceptance and rejection.

---

**21.** Without court approval, the AJEF eliminated the veterans' preference in 1983 in light of its finding that "there were no more veterans" because no foreign wars had been fought during the previous 10 years. (Tr. 166). After this change, the scoring system was changed so that an applicant could receive 40 points on the physical test, 25 points on the oral interview, and 35 points on the aptitude test.

The EEOC raises two objections to the scoring system. First, pointing to the Consent Judgment's provision that "[n]o more than 5 points shall be applied for each year up to two years' military service," § III.E.18, the Commission argues that the defendants violated the Consent Judgment by giving veterans 5 points for each of their first two years of military service. The Commission reads the Consent Judgment as allowing the veteran a maximum of 5 extra points. The court finds absolutely no merit in this argument. It is directly contradicted not only by the text of the Consent Judgment, but by plain sense: The three tests add up to 90 points, leaving 10, rather than 5 points for the veteran's preference.

Although the EEOC's first objection to the scoring system apparently militates in favor of restricting the number of points allocated for military service, plaintiff also argues that the AJEF violated the Consent Judgment by eliminating the veterans provision. It moves the court to remedy this violation by reinstating a veterans' preference. The court finds the AJEF technically in violation of the Consent Judgment on this point, but will not sanction the AJEF nor order the administrator to retain some type of veterans' preference in the absence of evidence that failure to do so would have an adverse impact on minority applicants to the apprentice program.

The arbitrary nature of the test is also evident in the oral portion of the examination. The oral exams were administered by two-person interview teams, made up of one Local 580 representative and one employer representative. Although a script of questions was provided the interviewers, it was not followed. Instead, each interview team apparently designed its own questions, and applied its own scoring formula. *See* testimony of Harold Bassen (Tr. 754).

While it is unclear from the evidence whether the defendants exploited the oral exam's potential for discriminatory abuse, the hearing established that the written test illegally discriminates against minority applicants. Before the hearing, the EEOC had demonstrated the adverse impact of the written test on minority applicants in an affidavit submitted by Dr. Don Schwartz, the EEOC's Chief Psychologist. *See* Schwartz Aff. filed in support of Motion for Contempt. Dr. Schwartz found that 72 percent fewer minorities received "High" Scores on the aptitude test than similarly situated white applicants, and 79.9 percent fewer minorities received "Medium" scores. *Id.*, ¶ 12. He also found that if the selection process were to include all applicants who obtained a score of 70 or higher (i.e., a passing score), the passing rate for minority applicants would be 74.2 percent of the passing rate for white applicants. *Id.*, ¶ 13. Dr. Schwartz found that the differences in passing rates for these scoring groups are statistically significant. *Id.*

It is well established that "a selection rate for minorities lower than 80% of the selection rate for the highest scoring group may be regarded as evidence of adverse impact." *Bushey v. New York State Civil Service Comm'n*, 733 F.2d 220, 222 n. 2 (2d Cir.1984), *cert. denied*, 469 U.S. 1117, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985). This is the EEOC's now famous "four-fifth's rule," which is set forth in 29 C.F.R. § 1607.4(D). *See Bushey, supra,* 733 F.2d at 222 n. 2. Under the case law, a test's failure to satisfy the four-fifth's rule establishes a prima facie violation of Title VII, requiring the defendant to respond with

proof that the test is job-related. *See id.* at 224–25; *see also New York City Transit Authority v. Beazer,* 440 U.S. 568, 584, 99 S.Ct. 1355, 1370, 59 L.Ed.2d 587 (1979); *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *Griggs, supra,* 401 U.S. at 431–36, 91 S.Ct. at 853–856; *Guardians Ass'n of the New York City Police Dep't, Inc. v. Civil Service Comm'n,* 630 F.2d 79, 86–87 (2d Cir.1980), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981). Dr. Schwartz's affidavit squarely placed this burden on the defendants. *See id.*

In attempting to demonstrate the test's job-relatedness the defendants faced a task already once unsuccessfully undertaken by the USDOL and severely if not fatally undermined by the great year-to-year variation in cut-off scores for apprentices and the lack of any discernible correlation between test scores and success in the program.

To make their case at the hearing, defendants principally relied on the testimony of Dr. Judah Gottesman. Dr. Gottesman is no stranger to these courts, having testified in the *Local 28* case in support of the apprentice exam sought to be used there. In reviewing his testimony in that case, both the district court and the Court of Appeals noted the "spotty and largely equivocal" nature of his testimony. *See* 401 F.Supp. at 480–81; 532 F.2d at 826. In this case his testimony was no more convincing, consisting of little more than conclusory allegations as to the test's general usefulness. Indeed, as Dr. Schwartz convincingly explained at the hearing, by Dr. Gottesman's reckoning the test would be an appropriate gauge of an individual's ability to perform all 12,000 jobs in the United States. (*See* Tr. 1014–15). Defendants' failure to meet their burden mandates the elimination of the written test. *See Bushey, supra,* 733 F.2d at 225 (citing cases).

In sum, the arbitrariness and irrelevance of the tests taken as a whole, the similarly arbitrary manner in which the oral portion has been administered, as well as the written test's illegal discrimination against mi-

nority applicants, make clear that a new selection process is necessary. The need for such relief is especially evident in this case, where the written portion of the test remains unvalidated after nine years and the court's previous efforts to institute temporary nondiscriminatory selection standards have been deliberately ignored by defendants, contrary to the Consent Judgment and court-ordered stipulations. *See Jones v. New York City Human Resources Admin.*, 539 F.Supp. 795, 798–800 (S.D.N.Y.1982) (Lasker, J.) (failure to validate test after five years results in alternative selection criteria); *Vulcan Pioneers, Inc. v. New Jersey Dep't of Civil Service*, 625 F.Supp. 527, 545 (D.N.J.1985) (where consent decree obligated state to create valid examination, its failure to do so violated consent judgment "irrespective of the adverse impact demonstrated by plaintiff"). *Cf. Paradise, supra*, —— U.S. at ——, 107 S.Ct. at 1068 n. 21 ("The difficulties of validating a [testing] procedure do not excuse [defendant's] delay in developing a test without adverse impact.").

The job of creating new selection criteria for admissions to the apprentice program is one for which the special master or administrator is well-suited. Shortly after his appointment, *see* Section III, *infra*, he should receive suggestions from the parties and complete a proposal for the court to review.[22]

■ Until a nondiscriminatory selection process is established, one minority apprentice shall be selected into the program for every non-minority selected. At least 30 apprentices must be enrolled in the apprentice program for the first sixty days of classes. The racial balance must be maintained throughout the three-year program. Thus, if a black apprentice drops out of the program and he is replaced by an alternate, that alternate must also be a minority.

This remedy, while it might be severe in other contexts, is justified not only by the defendants' history of discrimination, but, more importantly, by its similarity to a remedy which the defendants repeatedly agreed to and continue to endorse. To this day, defendants urge the court to adopt an order which would commit the AJEF to indenturing one minority apprentice for every nonminority. While they do so in order to win the court's acquiescence to the continued administration of the SATB–280, their willingness to impose this type of restriction on admissions diminishes any harshness in the court's action. The one-to-one quota requirement should eliminate deleterious consequences created by any delay in the implementation of nondiscriminatory selection criteria without unduly burdening third parties. *See Paradise, supra*, —— U.S. at ——, ——, 107 S.Ct. at 1067, 1070.

Finally, the actual selection process cannot continue to be administered solely by the AJEF. Until the membership goal is reached, apprentices shall be selected by a three-person selection board: as in *Local 28*, one designee will represent the defendants, one will represent the plaintiff, and one will represent the administrator. *See* —— U.S. at ——, 106 S.Ct. at 3030; 753 F.2d at 1188; 565 F.2d at 33–34.[23]

## D. DISCRIMINATION AGAINST MINORITY APPRENTICES

■ The principal focus of the hearing concerned evidence of discrimination against minority apprentices who actually began the apprentice program. The purpose of the Consent Judgment provisions governing the apprentice program is to in-

---

**22.** The court, however, will lend the administrator and the parties some guidance about the process it believes is appropriate. First, the medical and physical tests should be retained to insure apprentices are physically fit to perform iron work. Second, the testing process should be sure to determine whether an applicant is afraid of heights.

**23.** The administrator should review whether the percentage goal should be adjusted to reflect changes in the labor market. Plaintiff offered expert testimony tending to show that the goal for minority membership should be raised to approximately 40%. *See* Exh. 98; (Tr. 659). In light of the fact that this issue is of great import and was not identified by the court as one that would be addressed at the hearing, the court does not feel it would be appropriate to adopt plaintiff's evidence without giving defendants an opportunity to present data of their own.

crease the number of minority members of Local 580. To this date, that purpose manifestly has not been achieved. Over 40 percent of the minorities who began the program have dropped out. Exh. 68.[24] Much of the evidence at the hearing was devoted to explaining this high drop-out rate. Plaintiff established, far beyond any doubt, that this drop-out rate is attributable to defendants' failure to secure employment for minority apprentices, and, to a lesser extent, to their discrimination against and harassment of minority apprentices in the training aspect of the program.

**1) Employment**

The Consent Judgment imposes a duty on all defendants to provide work for apprentices. It provides in part that:

The AJEF shall ensure that each indentured apprentice receives training in technical knowledge and manipulative skills as follows:

.    .    .    .    .

(d) Local 580 and Allied shall insure that the apprentice continues to supplement his education through *daily* on-the-job work experience supervised by a mechanic or group of mechanics, to the extent that such work is sufficient to satisfy any on-the-job work experience necessary for membership in Local 580 after completion of the three (3) year program.

§ III.19 (emphasis added). This section is subject to defendants' general responsibility to insure that work opportunities are allocated on a nondiscriminatory basis. § III.2, 4.

Apprentices receive jobs in three ways. The first means is called "shaping" the Referral Hall: The apprentices go to the Referral Hall, where they sign in and are referred to jobs by the AJEF "business agent" on a first-come first-served basis determined by the number of consecutive days they have waited in the Hall. The second method is by "shaping" job sites: They go to particular job sites and directly approach the foremen about the possibility of work. The final means is by learning about jobs from their instructors, who themselves are foremen and often are knowledgeable about where work can be found.

The testimonial and statistical evidence of discrimination in referrals from the Hall was overwhelming. From the spotty records made available by defendants, the EEOC introduced an exhibit showing 42 instances in which white apprentices were referred out to jobs ahead of minorities who had logged more days in the Hall. Exh. 66.[25] If anything, this evidence probably underestimates the number of discriminatory referrals: The testimony established that white apprentices wrote down the names of absent white apprentices on the sign-in sheets, and back-dated their entries. (Tr. 107). Whether the AJEF business agents acquiesced in or were unaware of this fraudulent activity is unclear. In any case, it is evident that they did little to prevent it: At least one business agent acknowledged that the sign-in sheets were reviewed only periodically, and corrected only when the business agent believed the sheets to be inaccurate. (Tr. 968).

The anecdotal evidence of discriminatory referrals was substantial. One minority apprentice after another testified about instances in which he waited as many as 60 days in the Hall while white apprentices who had not been waiting as long were referred out ahead of them. *See, e.g.,* testimony of Lance Newton (Tr. 90–94); Dwight Washington (Tr. 456); Pedro Miranda (Tr. 417); Leroy Pratt (Tr. 63). When the minority apprentices were referred out for jobs, many found themselves on jobs that ended quickly and left them back in the Referral Hall. For example, William Waring waited three weeks in the Hall, got a one-day job, went back to the Hall and waited again. After receiving no job that lasted longer than a week, he dropped out of the program. (Tr. 406). Similarly, Pedro Miranda went to the Hall

---

**24.** Only 26% of the white apprentices dropped out. *See* Exh. 68.

**25.** Defendants' attempt to explain these referrals is not supported by the evidence and is rejected. *See* Exh. BB.

on a regular basis, but only received a single job, from which he was laid off. He returned to the Hall, waited for two weeks, and then abandoned the Referral Hall as a source of work.[26]

Witnesses repeatedly noted that the Hall was composed almost exclusively of minority apprentices waiting for work. *(See, e.g.,* Tr. 32; 416). Apparently, this is attributable not so much to discriminatory referrals as to the fact that white apprentices, often with defendants' aid, secured jobs from other sources. Thus, while long periods passed when very few apprentices of any race were referred from the Hall—for example, between February 1 and May 1 of 1984 only 16 apprentices were referred out to jobs—many white apprentices were working on jobs they received through other channels.

While the prevalence of white apprentices' securing work outside the hall is hard to pinpoint due to defendants' failure to record this information (Tr. 317–21; 335), the anecdotal evidence is overwhelming. Minority apprentices testified that white counterparts who had not been in the Referral Hall during the day arrived at the AJEF training school in the evening in workclothes, where they related stories of their days on the job. *(See, e.g.,* Tr. 417; 456). One white graduate of the apprentice program, Louis Cantelmo, testified that in his three years as an apprentice he never even went to the Referral Hall. Instead, he got a job through a white instructor he knew from childhood, and worked for the contractor he was assigned to for his entire apprenticeship. (Tr. 477–80). Minorities testified that their efforts to get jobs through the instructors were fruitless. *(See, e.g.,* Tr. 119).

Other white apprentices got jobs by "shaping" job sites. While it is harder to tie this success—and the minority apprentices' corresponding dismal failure—to the defendants, at least in some instances it appears that the defendants tipped off white apprentices as to which foremen were hiring. The evidence established that this was institutionalized through a "lightpost system," by which white apprentices would wait by a certain light post where a AJEF business agent would drive up and inform them of job opportunities. (Tr. 108).

The defendants offered little to refute these allegations. Their major evidence on this issue consisted of a study purporting to show that minority apprentices worked as many hours as their white counterparts. *See* Exh. 7. Not only was this study based on internally inconsistent records, *(see* Tr. 1001), but it did not include in its data base hours worked by apprentices who dropped out of the program. (Tr. 920–22). In light of the fact that many minorities dropped out of the program because they were not receiving job assignments, a study that purports to compare the relative hours worked by white and minority apprentices without including the hours worked by minority apprentices who dropped out of the program is absolutely meaningless.

It is obvious that major reform of the employment system is needed. The most obvious remedy is to bar apprentices from securing employment from any source other than the AJEF Referral Hall. In addition, to insure nondiscrimination in the quality of jobs apprentices receive, the referrals will be made on the basis of the number of hours apprentices have worked, rather than the number of days they have waited in the Hall. Thus, the apprentice who has worked the fewest hours and has signed into the hall will receive the first job that comes to the attention of the business agent. Finally, to eliminate the present situation where long periods exist where few or no referrals are made, the administrator must hear evidence and establish a mandatory ratio of journeymen to apprentices on all Local 580 jobs. *See Local 28, supra,* 753 F.2d at 1187.[27]

---

**26.** Miranda continued to attend the training classes until he was told that attendance at the referral hall was required of all apprentices.

**27.** The EEOC asks for a 1:4 ratio of journeymen to apprentices identical to that imposed in the *Local 28* case. In *Local 28,* however, the 1:4 ratio was imposed on the basis of, *inter alia,* a finding that a 1:4 ratio had traditionally been

## 2) Training Program

■ The EEOC also sustained its allegations that defendant AJEF violated the Consent Judgment by harassing and discriminating against minority apprentices in the training program. While testimony about in-class harassment was limited to a single incident in which an instructor told an ethnic joke (Tr. 419), minority apprentices were harassed and discriminated against by the manner in which the AJEF administered its rules. In general, minorities were repeatedly subjected to a hypertechnical reading of program requirements, while flagrant noncompliance by white apprentices was ignored or excused.

One prominent example of this phenomenon was the discriminatory manner in which apprentices were disciplined for missed classes. The AJEF rules provide that any apprentice with more than three unexcused absences must be brought before a disciplinary board and forced to repeat a year of classes. (Tr. 984). While this rule was consistently applied to black apprentices, white absences were often excused and ignored. *See* Exhs. 107, 110; (Tr. 984–90). For example, while black apprentice Lance Newton was forced to repeat a year after missing five classes, including one for which he was only 12 minutes late and had a doctor's excuse (Tr. 111–12), one white apprentice was allowed to graduate without attending his entire third year of classes, Defendants' Memorandum at 42, another was granted numerous excuses so he could plan his wedding, *id.* at 40, and a third was reprimanded but nevertheless graduated on time despite a repeated failure to attend classes. (Tr. 984–87).

The discriminatory application of rules was also manifest in the collection of dues. Reynold Lewis testified that after unsuccessfully attempting to obtain a job from the Referral Hall, he fell behind on his membership dues. He was brought before the disciplinary board, which refused to allow him to work out a payment schedule or any other accommodation. (Tr. 138–40).

Similarly, Pedro Miranda testified that after spending weeks in the Referral Hall without obtaining work, he decided to stop going to the Hall but to continue attending classes so he could learn the trade and graduate from the program. Mr. Cody, the AJEF administrator, told him that attendance in the Hall was required and that unless he continued to shape the Hall he would be brought up on disciplinary charges. Mr. Miranda dropped out of the program. (Tr. 416) It could not have been lost on Mr. Miranda that the white apprentices were not required to shape the hall (indeed, as mentioned above, few ever did). Nor could he have missed noting that like Mr. Lewis, the AJEF itself had prevented him from following the routine the program anticipated: Mr. Lewis could not afford to pay his dues because the defendants had failed to refer him work; Mr. Miranda did not wish to shape the Referral Hall because he could not obtain employment there.

The final type of harassment established by the hearing is defendants' attempts to retaliate against those who have assisted the EEOC with its case. Lance Newton was told by classmates and by Local 580 foremen that he was not working because he had "betrayed" Local 580 by talking to the EEOC. (Tr. 117). Mr. Nulty, an AJEF business agent, told Keith Johnson, a young black applicant to the apprentice program, that he would have been accepted into the program but for this lawsuit. (Tr. 450).

■ The remedy for this type of conduct is to allow all apprentices with any grievances of how they are treated to submit those grievances to the administrator. In addition, the administrator must in the future approve all disciplinary action taken by the AJEF. Finally, the court feels compelled to reiterate what it made plain at the hearing: any retaliation against any person for cooperation with the EEOC will result in the *most* severe of sanctions.

---

used in the trade. *See* 753 F.2d at 1187. Until such evidence is presented with respect to the ironworker trade, no such or similar ratio can be imposed.

## E. RECORD KEEPING & DATA PRODUCTION

█ The Consent Judgment contains numerous provisions designed to enable the EEOC and the court to monitor compliance with the Consent Judgment and the court's orders. Among the most important are section IV.19, which requires defendants to record information on apprentice hiring, section IV.20, which requires defendants to provide hiring records to the EEOC, and section III.E.22, which requires the AJEF to, *inter alia,* maintain and provide to the EEOC (1) copies of the recruitment notices it sends to Exhibit K organizations and (2) evaluations of its decisions on applicants to the apprentice program. There is no question but that defendants have not complied with each of these provisions.

With respect to certain record-keeping provisions, defendants do not dispute noncompliance. For example, Local 580 acknowledges its failure to provide information on apprentice referrals from the union hall as required by sections IV.19 and IV.20. *See* Defendants' Reply Memorandum at 25. Similarly, the AJEF acknowledges that it has failed to record recruitment notices as required by section III. E.22. (Tr. 996).

With respect to other record-keeping responsibilities, the defendants claim compliance but have little to show for their efforts. For example, Local 580 argues that from 1978 to 1984 it complied with the Consent Judgment by forwarding to the EEOC "employer reports" on which the employers recorded which apprentices they had hired. These reports, however, were often illegible and incomplete, and were never reviewed by defendants before being sent to the EEOC. Equally important, the reports did not contain important information required by the Consent Judgment, including when an apprentice was hired, the job he was hired for, the work the apprentice actually performed, and the number of hours he worked, including any overtime. *See* §§ IV.19, 20; (Tr. 302–03; 256–57); Exh. 3. Since 1984, Local 580 has not even provided the EEOC with the employer reports. (Tr. 530). While it claims to be working on an improved system, at this stage such a claim is not enough.

In sum, a major overhaul of defendants' record-keeping responsibilities is required. The EEOC has asked the court to select an "independent information management firm" to devise a computerized record-keeping system at defendants' expense. *See* Plaintiff's Proposed Order at 7. The court is unconvinced that such a system cannot be established without the services of an expensive private consultant. Instead, the court directs the administrator to devise, with the parties' input, an information tracking system. While the administrator should make every effort to limit the cost of such a system, the system must allow the plaintiff and the court to monitor compliance, and defendants must bear the full cost of implementing and administering it.

## III. SPECIAL MASTER

█ The EEOC has requested that the court appoint a special master or administrator pursuant to Rule 53, F.R.Civ.P. Rule 53 empowers the court to appoint a special master in any pending case "upon a showing that some exceptional condition requires it." Rule 53(b), F.R.Civ.P. The court agrees with the EEOC that defendants' history of discrimination and their failure to comply with the Consent Judgment and other court orders, as well as the need to better monitor defendants' compliance in the future, requires the full-time attention of a special master. *See Local 28, supra,* —— U.S. at ——, 106 S.Ct. at 3053; 532 F.2d at 829.

Perhaps recognizing the inevitability if not the need for the appointment of a special master, defendants move the court to appoint a magistrate in that capacity pursuant to 28 U.S.C. § 636(b)(2). Essentially, defendants claim they cannot afford the cost of an independent master. The court finds defendants' claim of impecuniousness unconvincing. In any event, it is far too late for them to raise this argument; they should have thought about the cost of remedial action while they were blatantly ignoring the Consent Judgment for over nine years. Moreover, the lengthy and detailed

supervision this case requires makes the appointment of a magistrate inappropriate. *See* Rule 53, F.R.Civ.P., note of advisory committee on rules (1983).

The parties shall submit on notice a proposed order detailing the administrator's duties. In general, the administrator must oversee all aspects of the case and supervise defendants' compliance with the court's orders, including the Consent Judgment. The administrator's duties shall include, but will not be limited to:

a) supervising the apprentice recruitment process;

b) supervising the apprentice selection process, including the development of new selection criteria and the appointment of a new selection board;

c) supervising apprentice employment and training, including the development and monitoring of a system to insure minority apprentices are accorded equal employment opportunities;

d) developing a new record-keeping system to enable the court, administrator, and EEOC to monitor defendants' compliance with the court's orders (including the Consent Judgment); and

e) reviewing evidence proffered by the parties to determine whether changes in the labor market require revision of the percentage goal for minority members in Local 580.

The administrator shall submit a quarterly report to the court, detailing defendants' compliance with the court's orders and the steps taken to insure future compliance. The cost of the administrator shall be charged upon and apportioned among the defendants as the court may direct, subject to the administrator's recommendation. The charge will be due on a quarterly basis. *See Local 28*, 12 Fed.Empl.Prac.Cas. (BNA) 733, 738 (S.D.N.Y.1975) (Werker, J.).

## IV. BACKPAY

■ The EEOC moves the court to hold backpay hearings to provide make-whole relief to the past victims of discrimination. "The Supreme Court has made clear that backpay is to be the rule rather than the exception under Title VII and that back pay is to be awarded whenever possible so as to deter Title VII violations and so as to 'make whole' the victims of past discrimination." *Local 28*, 532 F.2d at 832 (citing *Albermarle, supra*, 422 U.S. at 422, 95 S.Ct. at 2374). Accordingly, backpay hearings shall commence forthwith, and shall provide relief to those former apprentices or applicants to the apprentice program who can prove by documentary or testimonial evidence that defendants discriminated against them. *See id.*

## CONCLUSION

In sum, the court finds defendants Local 580 and AJEF in contempt of court for failing to comply with the Consent Judgment provisions relating to apprentice recruitment, selection, training, and record keeping and data production. The parties are directed to submit to the court on notice a proposed order reflecting the judgment and remedies contained in this opinion.

IT IS SO ORDERED.